## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 20-____ |
| v. | : | Date Filed: _____, 2020 |
| ABDUR RAHIM ISLAM | : | VIOLATIONS: |
| SHAHIED DAWAN | | 18 U.S.C. § 1962(d) (RICO conspiracy – 1 |
| KENYATTA JOHNSON | : | count) |
| DAWN CHAVOUS | | 18 U.S.C. §§ 1343, 1346 (honest services |
| | : | wire fraud – 8 counts) |
| | | 18 U.S.C. § 1952(a)(3) (use of interstate |
| | : | facility to further racketeering – 1 count) |
| | | 18 U.S.C. § 1343 (wire fraud – 6 counts) |
| | : | 26 U.S.C. § 7206(2) (false tax returns – 6 |
| | | counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | | Notices of Forfeiture |
| | : | |

## I N D I C T M E N T

## COUNT ONE

## CONSPIRACY TO COMMIT RACKETEERING
## 18 U.S.C. § 1962(d)

### THE GRAND JURY CHARGES THAT:

All dates and times in this Indictment are alleged to be "on or about" the specific date stated.

### The Enterprise

1.      Universal Community Homes (UCH), founded in 1993, was an organization that redeveloped residential and commercial properties into affordable housing in South Philadelphia neighborhoods. Universal Education Companies (UEC), founded in 2002, provided academic services and operations management for primary and secondary charter schools. UCH and UEC

(collectively referred to as "Universal Companies") were headquartered in Philadelphia's 2nd City Council District.

      2.     Between 2012 and 2017, UEC maintained management agreements with multiple schools operating in Philadelphia, Pennsylvania, and Milwaukee, Wisconsin, to manage the schools' leadership teams, create the schools' budgets and administer the payroll process, and ensure financial reporting was in compliance with the requirements of various government entities. UCH (the real estate development component) provided management and administrative support for UEC (the education arm). For example, UCH administered the payroll and provided procurement functions for UEC.

      3.     Universal Companies constituted an Enterprise as defined in Title 18, United States Code, Section 1961(4), namely, a group of individuals and entities associated in fact.  The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

## Relevant Entity

      4.     Universal Real Estate Development Corporation (URED) was a for-profit entity described as a vehicle to develop low-income housing projects.  According to its articles of incorporation, the entity's sole shareholder was Person 1, another founder of Universal Companies.  In actual operation, the entity was a partnership with the profits split among Person 1, ABDUR RAHIM ISLAM, and SHAHIED DAWAN.

## Roles of the Conspirators

      5.     Defendant ABDUR RAHIM ISLAM, a resident of the Eastern District of Pennsylvania, was a founding member of UCH and served on its Board of Directors and as the

President and Chief Executive Officer since the organization's inception.   Defendant ISLAM

also led UEC and served as its President and Chief Executive Officer.   As the Chief Executive

Officer, defendant ISLAM was primarily responsible for the day-to-day operations and oversaw

UCH and UCE, the real estate development and education arms of Universal Companies,

respectively.   Defendant ISLAM earned dual degrees from LaSalle University in accounting and

finance and was a Certified Public Accountant.   ISLAM received a salary of approximately

$170,000 annually, in addition to yearly bonuses ranging from $35,000 to $45,000 per year.

6.      Defendant SHAHIED DAWAN, a resident of the Eastern District of

Pennsylvania, was a former Auditor and Regional Assignment Manager with the federal

government.   In 1994, Defendant DAWAN transitioned to UCH as its Philadelphia-based Chief

Financial Officer.   He also served on the Board of Directors for UCH.   Defendant DAWAN

was responsible for Universal Companies' overall financial and contract management.

DAWAN received a salary of approximately $160,000 annually and also received $20,000

bonuses in 2014, 2015, 2016, and 2017.

## Associates of the Conspirators

7.      KENYATTA JOHNSON, charged elsewhere in this Indictment, was a resident of

the Eastern District of Pennsylvania, and formerly served as a State Representative for the 186th

Legislative District in the Pennsylvania House of Representatives.   In 2011, defendant

JOHNSON was first elected to represent the 2nd District in the Philadelphia City Council.

JOHNSON has maintained his City Council seat by winning re-election in every election cycle

since.   Throughout his tenure as a Councilman, JOHNSON has utlilized "Councilmanic

Prerogative," to effect zoning changes and impact the acquisition or transfer of real estate within

the 2nd District. In Philadelphia, "Councilmanic Prerogative" was a legislative practice through

- 3 -

which individual City Councilpersons influence nearly all of the land use decisions in their district. When invoked by a Councilperson to support or reject a development proposal, the use of the prerogative is almost always honored by the rest of the Council. On multiple occasions, defendant JOHNSON exercised "Councilmanic Prerogative" to benefit Universal Companies, which was headquartered in his district. Since December 2011, JOHNSON has been married to defendant DAWN CHAVOUS, who also served in various roles on JOHNSON's political campaigns and as a consultant to Universal Companies.

8.    DAWN CHAVOUS, charged elsewhere in this Indictment, a resident of the Eastern District of Pennsylvania, was a former Chief of Staff for a Pennsylvania state senator and Executive Director of a pro-charter school advocacy group. In 2010, defendant CHAVOUS formed Chavous Consulting, LLC. Chavous Consulting purportedly provided a variety of services including issue advocacy, fundraising for political campaigns or non-profits, planning events, and developing strategic plans and objectives for organizations. In 2014, approximately 31% of Chavous Consulting's revenue received in the business account was derived directly from Universal Companies. CHAVOUS's consulting business provided the vehicle to disguise bribe payments to her husband JOHNSON from ISLAM and DAWAN, using funds obtained from Universal Companies.

9.    Michael Bonds, charged elsewhere, was elected by the citizens of District 3 in Milwaukee, Wisconsin to serve on the Milwaukee Board of School Directors (MPS Board). Between April 2009 and April 2016, Bonds served as the Board's president. Bonds operated African-American Books and Gifts and used the entity as a vehicle to disguise bribe payments from ISLAM and DAWAN, using funds obtained from Universal Companies.

- 4 -

### Racketeering Conspiracy

10.   From at least in or around 2013 to on or about the date of this Indictment, in the Eastern District of Pennsylvania and elsewhere, defendants

### ABDUR RAHIM ISLAM and
### SHAHIED DAWAN,

along with others, known and unknown by the grand jury, being persons employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under the following statutes:

a.    Title 18, United States Code, Sections 1341 (relating to mail fraud);

b.    Title 18, United States Code, Sections 1341, 1346 (relating to honest services mail fraud);

c.    Title 18, United States Code, Sections 1343, 1346 (relating to honest services wire fraud);

d.    Title 18, United States Code, Section 1343 (relating to wire fraud);

e.    Title 18, United States Code, Section 1512 (relating to obstruction of justice);

f.    Title 18, United States Code, Section 1952 (relating to use of an interstate facility in aid of racketeering); and

Multiple acts involving acts involving:

g.    Bribery in violation of Wis. Stat. § 946.10; and

h.    Bribery in violation of 18 Pa. Cons. Stat. § 4701.

11.   It was part of the conspiracy that each defendant agreed that a conspirator would

commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

## Manner and Means of the Conspiracy

12.   The manner and means by which the defendants ABDUR RAHIM ISLAM and

SHAHEID DAWAN, agreed to conduct the affairs of the Enterprise included the following,

among others:

a.   engaging in a corrupt scheme in which JOHNSON and CHAVOUS received
     payments and things of value in exchange for JOHNSON using his position as a
     Philadelphia City Councilman to take official actions to benefit ISLAM,
     DAWAN, and Universal Companies, including but not limited to, introducing and
     voting upon spot zoning legislation related to a property held by Universal
     Companies, and blocking reversion to the City of Philadelphia of another property
     held by Universal Companies after it failed to develop the property pursuant to its
     agreement with the City;

b.   engaging in a corrupt scheme in which Bonds received payments and things of
     value in exchange for Bonds using his position as President of the MPS board to
     take a series of official actions advantageous to ISLAM, DAWAN, and Universal
     Companies, including but not limited to, advocating for and voting in favor of
     Universal's expansion of charter school operations in Milwaukee, motioning the
     MPS Board to lease Milwaukee Public School (MPS) property to ISLAM,
     DAWAN, and Universal Companies, motioning the MPS Board to approve more
     favorable lease terms to the benefit of ISLAM, DAWAN, and Universal
     Companies, and voting in favor of the more favorable lease terms;

c.   stealing funds in the custody of Universal Companies in order to support
     ISLAM's extravagant lifestyle;

d.   stealing funds from Universal Companies to pay "bonuses" to ISLAM and
     DAWAN, pay bribes to JOHNSON, CHAVOUS, and Bonds, and make political
     contributions in the name of ISLAM to candidates for federal and local political
     offices;

e.   hiding the thefts and bribe payments by creating sham contracts, invoices, and
     false entries in books and records; and

f.   obstructing justice by withholding records and documents subject to legal process.

- 6 -

**Milwaukee Board of School Directors**

13.    In 2012, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN began negotiating with the MPS Board to expand UEC's charter school operations to Milwaukee, Wisconsin.   Despite concerns expressed by members of UEC's Board of Directors regarding the financial viability of such an expansion, defendant ISLAM made the decision to expand charter school operations into Milwaukee anyway.

14.    On or about August 23, 2012, the MPS Board approved consideration of a charter school proposal by defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN .   On or about August 30, 2012, the MPS Board approved the start of negotiations formalizing a contract for Universal Companies to operate charter schools in Milwaukee.   On or about July 30, 2013, the MPS Board approved a five-year contract for Universal Companies' new entity in Milwaukee to operate two charter schools, the Millennium and the Renaissance Campus, beginning in the 2013-2014 school year. Universal Companies' Milwaukee entity received over $11,000,000.00 from the MPS to operate the Millennium and the Renaissance Campus.

15.    On January 28, 2013, defendant SHAHIED DAWAN advised defendant ABDUR RAHIM ISLAM that it would cost at least 2.5 million dollars to get the Milwaukee-based schools operational for the first academic year contemplated by its arrangement with MPS.

16.    On February 4, 2013, defendant SHAHIED DAWAN advised defendant ABDUR RAHIM ISLAM via email Universal Companies would need to cut consultants out of its operational budget in order to fund the expansion into Milwaukee.   Eight days later, defendant DAWAN informed defendant ISLAM that Universal Companies was running a substantial deficit and that additional staff reductions would be necessary to move forward with the Milwaukee schools.

- 7 -

17. On February 22, 2013, defendant SHAHIED DAWAN advised defendant ABDUR RAHIM ISLAM in an email that UCH was projecting a year end loss of approximately $200,000. In other words, capital from the real estate-side would not be available to support the education-side expansion. In that same email, defendant DAWAN suggested that a sale of the Royal Theater could close the gap.

18. Universal Companies' operation in Milwaukee lost money almost immediately. Universal Companies' new entity did not have nearly enough revenue to cover the costs associated with operating its Milwaukee charter schools. On September 16, 2014, MPS requested that defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN explain the operational deficit to MPS in order to remain in compliance with the July 2013 charter school contract. On September 22, 2014, defendant DAWAN responded in writing to MPS that poor student enrollment was to blame.

19. Despite the financial issues, in the fall and winter of 2014, defendant ABDUR RAHIM ISLAM continued to push for an expansion of the Milwaukee charter school program operated by Universal Companies. In December 2014, defendants ISLAM and SHAHIED DAWAN sought to open a third charter school in Milwaukee.

20. In December 2014, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN began paying bribes to Michael Bonds, charged elsewhere, then President of the MPS Board, using funds from Universal Companies. ISLAM, DAWAN, and Bonds disguised these bribes as payments to Bonds' entity "African American Books and Gifts" for books, art work, and media. Bonds did not disclose to the MPS Board these payments nor his arrangements and relationship with defendants ISLAM, DAWAN, and Universal Companies.

- 8 -

21.     In exchange for the payments and things of value, Bonds attended committee

meetings of the MPS and advocated on behalf of defendants ABDUR RAHIM ISLAM and

SHAHIED DAWAN and Universal Companies' Milwaukee-based education entity.   When

Universal Companies' proposal to open an additional school was heard by the MPS committee,

Bonds personally advocated in support of it.   After Bonds made his statement in support of

Universal Companies, the MPS committee approved the proposal by ISLAM and DAWAN to

open the additional school, and a recommendation was made to the full MPS Board to vote in

favor of the expansion.

22.     In addition to supporting Universal Companies' proposal to open an additional

campus, Bonds helped defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN and

Universal Companies with the passage of their lease agreement with the MPS Board.   In

December 2014, Bonds sat as a member of the MPS Board committee with jurisdiction over the

lease.   As a member of this committee, Bonds had the authority to bring motions and vote on the

various items heard by the committee.   On December 11, 2014, Bonds brought a motion to

support Universal Companies' lease of an MPS facility to house the additional campus.   Once

the motion was brought to the committee, Bonds voted in favor of the motion.

23.     On or about April 19, 2016, at a time when Universal Companies was

experiencing severe financial distress, Bonds motioned the MPS Board for approval to defer

lease payments of approximately $1,000,000 owed to MPS by Universal Companies' charter

school operation.

### The Royal Theater in Philadelphia

24.     In 2000, UCH acquired the Royal Theater, located at 1524-34 South Street,

Philadelphia, Pennsylvania, which is in KENYATTA JOHNSON's City Council district, from

- 9 -

the Preservation Alliance for Greater Philadelphia, for approximately $286,252.00. At that time, UCH planned to stabilize the building and then develop the property as an anchor building in that Cultural District. Between 2000 and 2008, UCH was unable to develop the Theater.

25. In 2008, UCH began exploring alternative uses for the property, specifically examining a residential and commercial mixed-use proposal for the property. Three years later, UCH presented a proposed mixed-use development to South Street West Business Association, which is a civic organization that describes itself as a partnership between long-standing and new businesses, professionals, and community organizations based on South Street west of Broad Street in Philadelphia. This proposal went nowhere. In early 2012, the City of Philadelphia Department of License and Inspections determined that UCH was in violation of a number of city ordinances due to the dilapidated state of the building and the property and issued citations to UCH for the violations.

26. In the summer of 2012, UCH listed the Royal Theater for sale but was unable to secure an agreement with any potential buyers.

27. In April 2013, UCH filed an application with Philadelphia's Historical Commission that proposed demolition of the Royal Theater and new construction on the lot. As part of the application, UCH described the financial hardship the Royal Theater created for UCH and represented that prior attempts to sell the property in 2012 failed because potential purchasers were unable to find an economically feasible use for the building as it was then zoned. In connection with the proposal, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN enlisted the aid of a successful Philadelphia-based developer ("Person 2") to support the development proposal and thereby provide credibility for their development plans. The

- 10 -

development plan for the Royal Theater envisioned by ISLAM, DAWAN, and Person # 2 required zoning changes to implement.

28.     In April 2013, many residents of the neighborhood surrounding the Royal Theater opposed the proposal and began taking legal actions that could have stripped UCH of its ownership and/or control of the property under an anti-blight program.

29.     In May 2013, a neighbor of the Royal Theater filed an action under Pennsylvania's Blighted and Abandoned Properties Conservatorship Law of 2008 ("Act 135") to award conservatorship of the property to another local developer.  According to Act 135, a "Party in Interest," defined as an owner, lien holder, a resident, or business owner within 500 feet of a property who has met certain criteria regarding neglect and detrimental conditions, may petition the Pennsylvania Court of Common Pleas to appoint a conservator to take possession and effectuate the necessary rehabilitation and management of the property. An Act 135 action may result in a property owner losing control and ownership rights of a property with little to no compensation if the owner does not act promptly to save the property from Conservatorship.

30.     There are two methods to receive a zoning variance in the City of Philadelphia:

        a.      The first and more traditional method is for the Zoning Board to hold a hearing and rule upon a proposed zoning variance.  The Zoning Board variance process is a lengthy one and provides the local community with the opportunity to influence the ultimate decision.  If a zoning variance does not receive local community support, the Zoning Board may reject the proposed variance.  Further, if the Board passes a variance, members of the local community could appeal the decision. The appeals process is time-consuming, costly, and could be detrimental to a proposed sale or development.

- 11 -

b.     The second method is for a City Councilperson to obtain a spot-zoning ordinance proposed via legislative act.  A proposal for spot-zoning legislation is typically conveyed by a Councilperson to the City of Philadelphia Law Department and Planning Commission which then drafts legislation that reflects the Councilperson's intent and support. Spot-zoning ordinances are a way to circumvent the lengthier process before the Zoning Board. Historically, the process involving the Zoning Board could delay a development project for years because local residents could easily pursue an appeal of the Zoning Board's determination.

31.     The same month the Act 135 action was filed, "Universal Companies" entered into a contractual agreement with DAWN CHAVOUS, operating as Chavous Consulting. Originally, CHAVOUS' agreement was a three-month contractual commitment.  After the three months, defendants ABDUR RAHIM ISLAM, SHAHIED DAWAN, and CHAVOUS agreed to extend her contract, so that in total it lasted from in or around May 2013 until in or around October 2014.

32.     DAWN CHAVOUS electronically submitted a total of five invoices via e-mail to defendant ABDUR RAHIM ISLAM or to defendant SHAHIED DAWAN, requesting payment under her contract with "Universal Companies."  CHAVOUS received five corresponding checks authorized by ISLAM and DAWAN that matched to her invoices, totaling $66,750.  The payments were drawn on the operating account of UCH at Wells Fargo Bank.

33.     DAWN CHAVOUS provided Universal Companies with very little work, generated minimal work product, and incurred minimal, if any, expenses on behalf of Universal Companies in return for the $66,750 in consulting fees her consulting firm received from UCH.

34.     After DAWN CHAVOUS received a check from UCH, she deposited it into a bank account in the name of Chavous Consulting and then immediately transferred large portions

of the funds to a personal bank account from which she made mortgage, loan, and credit card payments on behalf of herself and KENYATTA JOHNSON.

35.     In or around May 2013, defendant ABDUR RAHIM ISLAM arranged for a political fundraiser, to be co-hosted by Person 2, for KENYATTA JOHNSON's re-election campaign. The fundraiser occurred on June 4, 2013. Defendants ISLAM, SHAHIED DAWAN, and Person 2 planned for a meeting at the site of the fundraising event immediately before the fundraiser to discuss the Royal Theater.

36.     Neither defendant ABDUR RAHIM ISLAM nor defendant SHAHIED DAWAN disclosed to Person 2, the fundraiser's co-host and potential partner in the re-development of the Royal Theater, about the contractual arrangement between Universal Companies and KENYATTA JOHNSON's spouse, DAWN CHAVOUS.

37.     On or about July 10, 2013, defendant ABDUR RAHIM ISLAM met with KENYATTA JOHNSON to discuss the "preliminary plans" for the Royal Theater. Afterwards, defendant ISLAM notified Person 2 via email that JOHNSON agreed to "take the lead with the Mayor" and work on the zoning change pursued by defendants ISLAM and SHAHIED DAWAN.

38.     On or about October 22, 2014, DAWN CHAVOUS deposited a check from Universal Companies for $17,250.00.

39.     On or about October 23, 2014, KENYATTA JOHNSON attended a refresher course on Ethics Training for members of Philadelphia City Council, which specifically addressed conflicts of interest.

40.     On or about October 30, 2014, KENYATTA JOHNSON, despite the vocal opposition of a number of residents who lived near the Royal Theater, introduced City of

- 13 -

Philadelphia Bill Number 140857 that specifically benefitted UCH.  JOHNSON's bill proposed a zoning variance for the Royal Theater from Commercial Mixed Use 2 (CMX-2), which is designated for small-scale neighborhood storefront retail and office uses, to Commercial Mixed Used 3 (CMX-3), which is considered to be for a community- or region-serving commercial use. Further, CMX-3 zoning altered the parking requirements and height maximums of the buildings permitted to be constructed on the property.

41.      KENYATTA JOHNSON did not disclose the financial and contractual relationship between his spouse, DAWN CHAVOUS, and defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN and Universal Companies, to members of City Council, his staff, or other officials with the City of Philadelphia.

42.      KENYATTA JOHNSON did not recuse himself from participation in the zoning legislation sought by defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN and Universal Companies.

43.      By December 2014, KENYATTA JOHNSON's bill passed through City Council and was signed into legislation by the Mayor of Philadelphia.  The passage of the bill forced the withdrawal of the Act 135 suit that threatened Universal Companies' control of the Royal Theater.

44.      Despite the successful efforts of KENYATTA JOHNSON, DAWN CHAVOUS, and defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, to ease the zoning restrictions over development of the Royal Theater, Person 2 withdrew from the development project.

45.      After struggling with the property for nearly 14 years, and less than two years after the passage of Philadelphia Bill Number 140857 and removal of the zoning impediments,

Universal Companies' real estate arm UCH sold the Royal Theater for approximately

$3,700,000.00.   Universal Companies received over $2,700,000.00 in net profit from the sale,

after the payment of settlement and closing costs, real estate taxes, and consulting fees.

46.     Prior to the sale of the Royal Theater, Universal Companies experienced financial

difficulties related to the operations of its charter schools, particularly its Milwaukee operations.

In the months prior to the Royal Theater sale, UCH loaned significant amounts of money to

Universal Companies' individual charter schools to supplement their cash flow.   According to

UCH' accounting firm, UCH often deferred collection of management fees due from individual

charter schools in order to allow the charter schools to meet cash flow and operational needs.

The sale of the Royal Theater infused significant cash proceeds into Universal Companies to

offset the cash flow shortage.

### The Properties at 1309-1313 Bainbridge Street

47.     The properties located at 1309-1313 Bainbridge Street in Philadelphia are located

in KENYATTA JOHNSON's district.

48.     Universal Companies' real estate arm, UCH, partnered with the Pennsylvania

Housing Authority ("PHA") to create Uni-Penn, LLC.   Uni-Penn, LLC, in turn, owned Uni-

Penn Homeownership Inc. ("Uni-Penn").

49.     On or about January 27, 2005, the Philadelphia Redevelopment Authority

("PRA") signed a contract conveying the 1309-1313 Bainbridge Street parcels to Uni-Penn for a

nominal fee of $3.00, for the purpose of building 109 single-family units on the land. Under the

arrangement, Uni-Penn was supposed to begin construction in April 2005.   As part of the deal,

the parties also executed a Redevelopment Agreement which required Uni-Penn to complete

construction within 18 months, or by October 2006, or face the prospect of "reversion," whereby the PRA could re-claim ownership of the parcels.

50.     As of 2013, the 1309-1313 Bainbridge Street parcels remained undeveloped. The property also was strewn with trash and the subject of neighbors' complaints.

51.     In early 2014, PRA decided to begin the process of reversion, and an official from PRA telephoned KENYATTA JOHNSON to seek his support.  Although JOHNSON's support of reversion was not legally required, JOHNSON's support was needed as a practical matter because the Philadelphia City Council typically defers to the wishes of the Councilperson whose district contains a particular property.

52.     On January 14, 2014, DAWN CHAVOUS contacted defendant ABDUR RAHIM ISLAM, the person to whom CHAVOUS reported and who authorized all of UCH's payments to Chavous Consulting, via email to warn him that the City of Philadelphia intended to revert the 1309-1313 Bainbridge Street parcels owned by UCH's partnership.

53.     Shortly thereafter, KENYATTA JOHNSON advised the PRA that he would not support the reversion, which had a "chilling effect" and halted the reversion process.  As of 2015, the 1309-1313 Bainbridge Street parcels were valued between $2,600,000 and $3,500,000.

## Fraud, Hidden Income and Tax Evasion

54.     Between 2010 and 2016, defendant ABDUR RAHIM ISLAM drew significant sums of money from UCH in the form of bonuses and travel or expense reimbursements, in addition to his annual salary.  Although UCH's Board of Directors (the Board) was charged with reviewing and approving UCH's financials and major initiatives on a quarterly or annual basis, defendants ISLAM and SHAHIED DAWAN used their positions as CEO and CFO respectively to pay themselves bonuses without the approval or knowledge of the UCH Board.  Defendants

- 16 -

ISLAM and DAWAN paid themselves bonuses even while Universal Companies was
hemorrhaging money due to the failed charter school expansion in Milwaukee.

### Fake Consulting Business and Deductions

55.    Defendant ABDUR RAHIM ISLAM controlled the finances of both URED and
ORED.  Between 2011 and 2016, defendant ISLAM received significant distributions and
"expense reimbursement" payments from ORED (another entity) and URED, despite the fact
that neither entity had any meaningful business activity supporting or justifying the payments.
Despite this lack of demonstrable business activity, both entities "reimbursed" ISLAM for
"business expenses" in excess of $140,000 from ORED, and $88,000 from URED which
included approximately $3,000 in bribe payments made to Michael Bonds.  ISLAM
"reimbursed" himself for "business expenses" without the knowledge of Person 1, his putative
partner in the entities.

### Embezzled Income from Universal Companies

56.    Defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN arranged for
UEC and its charter schools to pay management fees to UCH.  Part of these fees were then used
by UCH to reimburse expenses incurred by Universal Companies' executive management team
to support and oversee the management and operations of the charter schools.  Defendants
ABDUR RAHIM ISLAM and SHAHIED DAWAN used UCH's funds to pay ISLAM excessive,
inflated, or outright fraudulent reimbursements for "travel" or other purported "business
expenses."  Defendant ISLAM would pad his "expenses" related to the operation of Universal
Companies, including the charter schools, with a variety of personal expenses that should not
have been reimbursed.  For example, defendant ISLAM submitted his personal car insurance,
political contributions, personal vacations, and gym memberships as "business expenses" which

- 17 -

were reimbursed by UCH and also not included as income on his IRS Forms 1040. ISLAM's "reimbursements" were reviewed and approved by defendant DAWAN outside the standard procedures for Universal Companies and without proper and detailed supporting documentation.

57. Defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, as the chief executives of UCH, and without notice to the Board, also authorized defendant ISLAM to receive large sums of "pocket money" or per diem from UCH. Between in or about January 2014 and in or about June 2016, UCH "reimbursed" ISLAM approximately $108,000 for expenses over and above his "documented" expenses. ISLAM also received $50.00 per week in miscellaneous cash from UCH up until July 2014. After July 2014, ISLAM received miscellaneous cash from UCH in the amount of $100.00 per week. In addition to the weekly miscellaneous cash payments, ISLAM received an additional $100.00 cash per day when he travelled for Universal Companies even though UCH also reimbursed him for any "documented" expenses, such as meals, on those same trips.

58. In early 2017, as Universal Companies's financial disaster in Milwaukee was coming to a head, defendant ABDUR RAHIM ISLAM explored a new method to obtain Universal Companies' funds. In a text message to defendant SHAHIED DAWAN on February 24, 2017, defendant ISLAM followed up on a proposed personal "loan" from Universal Companies to ISLAM in the amount of $50,000. ISLAM wrote to DAWAN, "Here's how the $50K loan could work. Paid back by taking next year bonus for 2years ($100K) deducted by $50k loan and process $50k normally. What do you think?"

59. Defendant SHAHIED DAWAN responded via text, "I still don't see how this gets through audit." Defendant DAWAN explained via text, ". . . [the auditors] will be looking for

- 18 -

board approval, every [sic] since those donations from those schools."  By March 9, 2017,
Universal Companies pulled out of Milwaukee before the end of the school year.

## Overt Acts

In furtherance of the conspiracy and to affect the object thereof, the defendants and or
other co-conspirators known and unknown committed the following overt acts, among others, in
the Eastern District of Pennsylvania, the Eastern District of Wisconsin, and elsewhere:

### I.  Official Acts in Milwaukee Obtained Through Bribery

### A.  Expanding Universal's Charter School Operations

1.     On or about December 9, 2014, Michael Bonds, charged elsewhere, appeared at a
subcommittee meeting of the MPS Board and personally advocated in support of the expansion
sought by defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, to include the
opening of an additional campus by the charter school entity operated by Universal Companies
in Milwaukee, Wisconsin.

2.     On or about December 11, 2014, Michael Bonds brought a motion before a
subcommittee of the MPS Board supporting the lease of an MPS building sought by defendants
ABDUR RAHIM ISLAM and SHAHIED DAWAN to house the additional Milwaukee school
campus awarded in the expansion.

3.     On or about December 11, 2014, Michael Bonds voted in favor of the motion he
introduced before the subcommittee supporting the lease of an MPS building to the additional
charter school campus awarded in the expansion.

4.     On or about December 18, 2014, Michael Bonds presided over a meeting of the
full MPS Board at which the expansion of the charter school operations sought by defendants
ABDUR RAHIM ISLAM and SHAHIED DAWAN was approved by the full MPS Board.

- 19 -

**B. Securing Revised Lease Terms Favorable to Universal Companies**

5.     On or about September 26, 2015, defendant ABDUR RAHIM ISLAM and Michael Bonds corresponded via email, and in that exchange, defendant ISLAM relayed instructions for Bonds, crafted by ISLAM and defendant SHAHIED DAWAN, which included detailed figures and amounts for Bonds to put before the MPS Board regarding lease deferments favorable to Universal Companies and its Milwaukee operation.

6.     On or about April 19, 2016, at a subcommittee meeting of the MPS Board, Michael Bonds motioned the Board for approval of new lease terms favorable to defendants ABDUR RAHIM ISLAM, SHAHIED DAWAN, and Universal Companies' charter school operation in Milwaukee, Wisconsin.

7.     On or about April 19, 2016, Michael Bonds voted in favor of the new lease terms - which deferred lease payments of approximately $1,000,000 owed by the charter school operations of Universal Companies – that Bonds had introduced before the subcommittee of the MPS Board, which were then, in turn, recommended to the full MPS Board and ultimately approved.

**II.     The Creation of False Documents to Disguise the Bribe Payments to Bonds**

8.     On or about December 19, 2014, Bonds and others known to the grand jury created a false invoice, which was then transmitted via email from Milwaukee, Wisconsin to Philadelphia, Pennsylvania, that sought installment payments from Universal Companies to Michael Bonds' company "African American Books and Gifts."

9.     On or about April 21, 2016, defendants ABDUR RAHIM ISLAM, SHAHIED DAWAN, and Bonds caused an email to be sent from Milwaukee, Wisconsin, to ISLAM and SHAHIED DAWAN in Philadelphia, Pennsylvania.   The email contained another fake invoice

and a subject line "BondsBooks10.pdf," and it sought payment to be transmitted via Federal Express.

### III.      The Corrupt Payments from Islam and Dawan to Bonds

10.      In furtherance of their criminal schemes, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN paid approximately $18,000 in bribes to Michael Bonds.  On or about the dates set forth below, ISLAM and DAWAN caused the following payments to be issued to Bonds' African American Books and Gifts from accounts controlled by defendant ISLAM and/or Universal Companies:

| Overt Act | Check No. | Date Issued | Amount |
|---|---|---|---|
| 10(a) | #1962 | December 24, 2014 | $ 2,000 |
| 10(b) | #170 | January 21, 2015 | $ 3,000 |
| 10(c) | #1053 | February 18, 2015 | $ 2,000 |
| 10(d) | #1110 | March 6, 2015 | $ 1,000 |
| 10(e) | #1149 | April 1, 2015 | $ 1,000 |
| 10(f) | #1639 | June 29, 2015 | $ 1,000 |
| 10(g) | #1847 | September 28, 2015 | $ 2,500 |
| 10(h) | #1925 | November 4, 2015 | $ 1,500 |
| 10(i) | #1062 | November 30, 2015 | $1,500 |
| 10(j) | #1066 | January 4, 2016 | $1,500 |
| 10(k) | #2212 | April 22, 2016 | $ 1,000 |

11.     Defendant SHAHIED DAWAN caused check #1962 to be shipped via Federal Express from Philadelphia, Pennsylvania to Milwaukee, Wisconsin, where it was ultimately received by Michael Bonds.

12.     On or about January 21, 2015, for the second installment payment, defendant ABDUR RAHIM ISLAM hand-delivered the $3,000 payment to Michael Bonds in Milwaukee, Wisconsin.

13.     On or about April 22, 2016, defendant SHAHIED DAWAN caused check # 2212 to Michael Bonds' company to be shipped via Federal Express from Philadelphia, Pennsylvania, to Milwaukee, Wisconsin.

### IV.     Official Acts in Philadelphia Obtained Through Bribery

#### A.     The Royal Theater

14.     On or about October 16, 2014, defendant SHAHIED DAWAN transmitted to defendant ABDUR RAHIM ISLAM via email a draft of the rezoning ordinance for the Royal Theater that became Philadelphia Bill Number 140857 in advance of a meeting that same day between defendant ISLAM and KENYATTA JOHNSON to discuss the Royal Theater property.

15.     On or about October 30, 2014, KENYATTA JOHNSON introduced City of Philadelphia Bill Number 140857 that specifically benefitted Universal Companies. JOHNSON's bill proposed a zoning variance allowing for expanded commercial use of the property occupied by the Royal Theater and also altering the parking requirements and height maximums for buildings constructed on the property.

16.     On or about December 11, 2014, KENYATTA JOHNSON voted in support of City of Philadelphia Bill Number 140857, and the bill was passed by City Council.

### B. The Properties at 1309-1313 Bainbridge Street

17.     On or about January 16, 2014, DAWN CHAVOUS sent an email to defendant ABDUR RAHIM ISLAM, warning him about the "[p]roperties the City [of Philadelphia] wants to take from [UCH] located at 13th and Bainbridge."

18.     Shortly thereafter, KENYATTA JOHNSON advised the PRA that he would not support the City of Philadelphia's attempt to revert the properties at 13th and Bainbridge owned by UCH's partnership, effectively halting the reversion process and allowing the UCH partnership to retain the properties.

## V.  The Creation of False Documents to Disguise Bribe Payments to Kenyatta Johnson

19.     On or about June 10, 2013, defendant SHAHIED DAWAN transmitted by email to defendant ABDUR RAHIM ISLAM and DAWN CHAVOUS the executed contract between Chavous Consulting and Universal Companies, specifying a start date of May 1, 2013, and a $4,500.00 monthly consulting fee to be paid to Chavous Consulting.

20.     In furtherance of their criminal schemes, on or about the dates set forth below, DAWN CHAVOUS created and caused to be transmitted by email to defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN invoices purportedly justifying the payments from Universal Companies to Chavous Consulting from an account controlled by UCH:

| Overt Act | Date Transmitted | Amount |
| --- | --- | --- |
| 20(a) | August 1, 2013 | $13,500.00 |
| 20(b) | September 24, 2013 | $4,500.00 |
| 20(c) | December 31, 2013 | $18,000.00 |
| 20(d) | April 28, 2014 | $13,500.00 |
| 20(e) | September 21, 2014 | $17,250.00 |

## VI.   The Corrupt Payments from Islam and Dawan

21.   In furtherance of their criminal schemes, on or about the dates set forth below, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN caused the following payments to be issued to Chavous Consulting from an account controlled by Universal Companies:

| Overt Act | Check No. | Date Issued | Amount |
| --- | --- | --- | --- |
| 21(a) | 17271 | August 2, 2013 | $13,500.00 |
| 21(b) | 17479 | October 8, 2013 | $4,500.00 |
| 21(c) | 17713 | January 2, 2014 | $18,000.00 |
| 21(d) | 18159 | May 12, 2014 | $13,500.00 |
| 21(e) | 18631 | October 10, 2014 | $17,250.00 |

22.   On or about September 27, 2016, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, and Universal Companies, sold the Royal Theater for approximately $3,700,000.00.

## VII.    Fraud and Embezzlement

23.    Between 2012 and 2016, defendant ABDUR RAHIM ISLAM received the

following payments from Universal Companies, which defendants ISLAM and SHAHIED

DAWAN authorized and characterized as "bonuses" or "pay increase differential:"

| Overt Act | Amount | Date | Memo Line of Check |
|-----------|--------|------|--------------------|
| 23(a) | $35,000 | June 20, 2012 | "Bonus" |
| 23(b) | $35,000 | June 20, 2013 | "Bonus" |
| 23(c) | $15,000 | February 8, 2014 | "Pay Increase Differential' |
| 23(d) | $35,000 | June 4, 2014 | "2013-2014 Bonus" |
| 23(e) | $15,000 | February 2, 2015 | "Bonus" |
| 23(f) | $30,000 | April 9, 2015 | "Bonus 2014-2015" |
| 23(g) | $35,000 | August 26, 2016 | Payment Issued through Payroll |

24.    Between 2014 and 2016, defendant SHAHIED DAWAN received the following

payments from UCH, which defendants ABDUR RAHIM ISLAM and DAWAN authorized and

characterized as "bonuses":

| Overt Act | Amount | Date | Memo Line of Check |
|-----------|--------|------|--------------------|
| 24(a) | $20,000 | June 12, 2014 | 2013-2014 FY Bonus |
| 24(b) | $20,000 | February 25, 2015 | 2014-2015 FY Bonus |
| 24(c) | $20,000 | June 17, 2016 | Payment Issued through Payroll |
| 24(d) | $20,000 | February 10, 2017 | Payment Issued through Payroll |

25.     On or about January 22, 2015, defendant ABDUR RAHIM ISLAM notified defendant SHAHIED DAWAN via text message that he "had to write the [$3,000] check to Bonds (emergency)."   Subsequently, on or about July 16, 2015, defendant ISLAM submitted a written reimbursement request to defendant DAWAN, for payment by UCH, and listed in the "supporting documentation" the $3,000 bribe payment to Bonds as a business expense described as "Purchase of African American Books."

All in violation of Title 18 United States Code, Section 1962(d).

## COUNTS TWO THROUGH SEVEN

### HONEST SERVICES WIRE FRAUD
### 18 U.S.C. §§ 1343, 1346

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1, 2, 4, 5, 6, 9, 8, 12(b), 12(e) through 12(f), 13 through 23, and 55, and Overt Acts 1 through 13 of Count One are incorporated herein by reference.

2.      Michael Bonds, charged elsewhere, as a member of the MPS Board, owed the City of Milwaukee and its citizens a duty of honest services in the performance of his official position.

3.      From in or about December of 2014 to in or about February of 2018, in the Eastern District of Pennsylvania, and elsewhere, defendants

### ABDUR RAHIM ISLAM and
### SHAHIED DAWAN

knowingly devised and participated in a scheme and artifice to defraud and to deprive the citizens of Milwaukee, Wisconsin of their right to the honest services of MPS Board President Michael Bonds through bribery.

### Manner and Means

### Payments to Michael Bonds

4.      Beginning in December 2014, and continuing through April 22, 2016, on the dates and in the amounts set forth in Overt Acts 10(a) through 10(k) of Count One, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN paid approximately $18,000 and other things of value in bribes to Michael Bonds using Universal Companies' funds.

**Official Acts**

5.     In exchange for the payments and the things of value given by defendants
ABDUR RAHIM ISLAM and SHAHIED DAWAN, Michael Bonds performed the official acts
set forth in Overt Acts 1 through 7 of Count One.

**Concealing the Bribes**

6.     Defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN and Michael
Bonds created or caused others to create false documents as set forth in Overt Acts 8 through 9
of Count One to disguise the bribe payments.

**Execution of the Scheme**

7.     For the purpose of executing and attempting to execute the scheme and artifice to
defraud and deprive the citizens of Milwaukee of the honest services of a member of the MPS
Board, on or about the dates below in the Eastern District of Pennsylvania and elsewhere,
defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, and others, knowingly caused to
be transmitted, and aided and abetted the transmission of, by means of wire communication in
interstate commerce, signals and sounds, that is, the below electronic mail messages, each
transmission constituting a separate count:

| Count | Interstate Wire Communication (Electronic Communications) | Approximate Date |
|---|---|---|
| 2 | Email communication from ISLAM in Pennsylvania to Bonds in Wisconsin, relaying instructions from Defendant SHAHIED DAWAN, including detailed figures and amounts related to the lease deferments sought from MPS. | Sept. 26, 2015 |
| 3 | Email from Universal Companies' office in Wisconsin to Defendant SHAHEID DAWAN and Defendant ABDUR RAHIM ISLAM in Pennsylvania, transmitting invoice from African American Books and Gifts in the amount of $2,500 | Sept. 28, 2015 |
| 4 | Email from Universal Companies' office in Wisconsin to Defendant SHAHEID DAWAN and Defendant ABDUR RAHIM ISLAM in Pennsylvania, transmitting invoice from African American Books and Gifts in the amount of $1,500 | Oct. 20, 2015 |
| 5 | Email from Universal Companies' office in Wisconsin to Defendant SHAHEID DAWAN and Defendant ABDUR RAHIM ISLAM in Pennsylvania, transmitting invoice from African American Books and Gifts in the amount of $1,500 | Nov. 26, 2015 |
| 6 | Email from Universal Companies' office in Wisconsin to Defendant SHAHEID DAWAN and Defendant ABDUR RAHIM ISLAM in Pennsylvania transmitting invoice from African American Books and Gifts in the amount of $1,000 | Dec. 30, 2015 |
| 7 | Email from Universal Companies' office in Wisconsin to Defendant SHAHEID DAWAN and Defendant ABDUR RAHIM ISLAM in Pennsylvania transmitting invoice from African American Books and Gifts in the amount of $1,500 | April 21, 2016 |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT EIGHT

## USE OF INTERSTATE FACILITY TO FURTHER RACKETEERING
18 U.S.C. § 1952(a)(3)

### THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1, 2, 4, 5, 6, 9, 8, 12(b), 12(e) through 12(f), 13 through 23, and 55,

and Overt Acts 1 through 13 of Count One are incorporated herein by reference.

2.      The laws of the State of Wisconsin, specifically Wis. Stat. § 946.10, provide that

bribery is a violation of the laws of the State of Wisconsin.

3.      On or about September 26, 2016, in the Eastern District of Pennsylvania and

elsewhere, defendants

### ABDUR RAHIM ISLAM and
### SHAHIED DAWAN,

aided and abetted by Michael Bonds, charged elsewhere, and others, known and unknown to the

grand jury, used a facility in interstate/foreign commerce, namely an email server, with the intent

to further an unlawful activity, that is, bribery and extortion in violation of Wis. Stat. § 946.10

and 18 U.S.C. § 1951, and thereafter committed and attempted to commit the crimes of bribery

and extortion to further such unlawful activity.

All in violation of Title 18, United States Code, Section 1952(a)(3) and 2.

## COUNTS NINE THROUGH TEN

### HONEST SERVICES WIRE FRAUD
### 18 U.S.C. §§ 1343, 1346

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1, 2, 5 through 8, 12(a), 12(e) through 12(f), 15 through 17, 24

through 53 and Overt Acts 14 through 22 of Count One are incorporated herein by reference.

2.      Defendant KENYATTA JOHNSON, as an elected member of Philadelphia City

Council, representing citizens of the 2nd District, owed the citizens of the 2nd District and the

citizens of Philadelphia a duty of honest services in the performance of his official position.

3.      From in or about 2013 to on or about the date of this Indictment, in the City of

Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### ABDUR RAHIM ISLAM,
### SHAHIED DAWAN,
### KENYATTA JOHNSON, and
### DAWN CHAVOUS

knowingly devised and participated in a scheme and artifice to defraud and to deprive the

citizens of the 2nd District and the citizens of Philadelphia of their right to the honest services of

defendant KENYATTA JOHNSON through bribery.

### Purposes of the Scheme

4.      It was a purpose of the scheme for defendants KENYATTA JOHNSON and

DAWN CHAVOUS to receive payments and things of value in exchange for defendant

JOHNSON using his position as a Philadelphia City Councilman to take official actions to

benefit defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN, and Universal

Companies, including but not limited to, introducing and voting upon spot zoning legislation

related to a property held by Universal Companies and blocking reversion to the City of

- 31 -

Philadelphia of another property held by Universal Companies after it failed to develop the property pursuant to its agreement with the City.

5.      It was a further purpose of the scheme to conceal and protect the activities of the co-schemers from detection and prosecution by law enforcement officials as well as from exposure by the news media, through means that included, but are not limited to, the falsification of documents.

## Manner and Means

6.      From May 2013 through October 2014, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN caused Universal Companies to enter into an original and series of renewal contracts with defendant DAWN CHAVOUS who operated as Chavous Consulting.

7.      In order to be paid under these contracts and renewal contracts, defendant DAWN CHAVOUS electronically submitted a total of five invoices via e-mail to defendant ABDUR RAHIM ISLAM or defendant SHAHIED DAWAN.

### Corrupt Payments to Defendants Kenyatta Johnson and Dawn Chavous

8.      Beginning in or around August 2013 and continuing through in or around October 2014, defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN caused Universal Companies to send defendant DAWN CHAVOUS a series of five checks totaling approximately $66,750, as set forth in Overt Acts 21(a) through 21(e) of Count One.

### Official Acts by Kenyatta Johnson

9.      In exchange for the payments given by defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN to defendant DAWN CHAVOUS, defendant KENYATTA JOHNSON performed the official acts set forth in Overt Acts 14 through 18 of Count One related to The Royal Theater and the properties at 1309-1313 Bainbridge Street, Philadelphia.

## . Concealing the Bribes

10.     In order to conceal the link between the payments and official acts of defendant

KENYATTA JOHNSON, defendants ABDUR RAHIM ISLAM, SHAHIED DAWAN, DAWN

CHAVOUS, and JOHNSON created a bogus consultant relationship between UCH and Chavous

Consulting and prepared a series of contracts.

## Execution of the Scheme

11.     For the purpose of executing and attempting to execute the scheme and artifice to

defraud and deprive the citizens of the 2nd District and of Philadelphia of the honest services of

Councilman KENYATTA JOHNSON, on or about the dates below, in the Eastern District of

Pennsylvania and elsewhere, defendants ABDUR RAHIM ISLAM, SHAHIED DAWAN,

DAWN CHAVOUS, and JOHNSON and others, knowingly caused to be transmitted, and aided

and abetted the transmission of, by means of wire communication in interstate commerce,

signals, that is, the below electronic mail messages, each transmission constituting a separate

count:

| Count | Date | Description |
|-------|------|-------------|
| 9 | October 16, 2014 | Email forwarding draft zoning ordinance from defendant SHAHIED DAWAN to defendant ABDUR RAHIM ISLAM in advance of defendant ISLAM's meeting with defendant KENYATTA JOHNSON |
| 10 | October 22, 2014 | Electronic image transmitted by Wells Fargo Bank from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $17,250.00 from Universal Companies' account ending in 9642 |

All in violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNTS ELEVEN THROUGH SIXTEEN

### WIRE FRAUD
### 18 U.S.C. § 1343

## THE GRAND JURY FURTHER CHARGES THAT:

1.      Paragraphs 1, 2, 4 through 6, 12(a) through 12(f), 54 through 59, and Overt Acts

23 through 25 of Count One are incorporated herein by reference.

### The Scheme to Defraud

2.      From in or around 2011 and continuing through in or around the date of this

Indictment, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere,

defendants

### ABDUR RAHIM ISLAM and
### SHAHIED DAWAN

knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money

and property by means of materially false and fraudulent pretenses, representations, and

promises.

3.      It was the object of the scheme described in paragraph 2 for defendants ABDUR

RAHIM ISLAM and SHAHIED DAWAN to use the resources of Universal Companies in

various ways to enrich themselves.

### Manner and Means

4.      The means and methods by which defendants ABDUR RAHIM ISLAM and

SHAHIED DAWAN carried out the scheme are described in paragraphs 13(a) through 13(f), and

14 through 58 of Count One of this indictment.

Case 2:20-cr-00045-GAM   Document 1   Filed 01/28/20   Page 35 of 43


**Acts in Furtherance of the Scheme**

5.    Defendants ABDUR RAHIM ISLAM and SHAHIED DAWAN executed and

attempted to execute the scheme and artifice to defraud, and in furtherance of the scheme

transmitted and caused to be transmitted, in interstate commerce, the following wire

communications in the form of writings, signs, signals, pictures, and sound as set forth, each

transmission constituting a separate count:

| Count | Date | Description | Conspirators' Characterization |
|-------|------|-------------|-------------------------------|
| 11 | July 16, 2015 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $70,472.72 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |
| 12 | October 10, 2015 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $35,000 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |
| 13 | January 16, 2016 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $30,000 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |

| 14 | April 28, 2016 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server resulting from the withdrawal of $30,000 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |
| 15 | June 14, 2016 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $30,000 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |
| 16 | June 30, 2016 | Electronic image transmitted by Wells Fargo Bank, from a branch in Philadelphia, PA to an out-of-state server, resulting from the withdrawal of $30,000 from Universal Companies' account ending in 9642 | Islam Expense Reimbursement |

All in violation of Title 18, United States Code, Section 1343.

## COUNTS SEVENTEEN THROUGH TWENTY-TWO

### FALSE TAX RETURNS
### 26 U.S.C. § 7206(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1, 2, 4 through 6, 12(a) through 12(f), 54 through 59, and Overt Acts 23 through 25 of Count One are incorporated herein by reference

2.      The Internal Revenue Service (IRS) was an administrative agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States, including the assessment and collection of federal income taxes.

3.      Over a six-year period, defendant ABDUR RAHIM ISLAM, a certified public accountant, prepared fraudulent joint federal income tax returns for himself and his spouse. From 2011 through 2016, in the aggregate, defendant ISLAM underreported his taxable income by approximately $551,202, resulting in a tax loss to the government totaling approximately $188,764.00.

4.      Defendant ABDUR RAHIM ISLAM hid and underreported his income in a variety of ways, including the following:

     a.   Through his control of Universal Companies, defendant ABDUR RAHIM ISLAM arranged for "bonus" payments to be generated to him outside of Universal Companies' established payroll accounting system, ensuring the payments would not appear on his W-2s. Defendant ISLAM then treated the "bonus" payments and income from URED as "Gross Receipts" from his Schedule C consulting business.   Defendant ISLAM then fraudulently reduced the income attributable to his Schedule C business by inflating or creating false and

- 37 -

fictitious business expenses to offset against his "Gross Receipts," thereby reducing any taxable income.

b. As CEO of Universal Companies, defendant ABDUR RAHIM ISLAM was reimbursed for travel and business-related expenses.   Defendant ISLAM padded any legitimate business expenses he submitted with a variety of personal expenses which should not have been reimbursed by Universal Companies.   For example, ISLAM was reimbursed for his personal car insurance, political contributions, personal vacations for himself and others, multiple gym memberships, and personal meals, including family celebrations.   ISLAM did not include these personal expense reimbursements as income on his IRS Forms 1040.

5. On or about the dates listed in the chart below, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ABDUR RAHIM ISLAM**

willfully aided, assisted, procured, counseled, and advised the preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax Returns, Forms 1040 for defendant ISLAM and his spouse, when the defendant ISLAM knew and believed that the individual returns were materially false for each of the following years:

| Count | Return Type | Tax Year | Method Filed | Date Filed | False Line Items |
|-------|-------------|----------|--------------|------------|------------------|
| 17 | Form 1040, Individual Income Tax Return | 2011 | Electronically Filed | Oct. 15, 2012 | Line 22 Total Income |
| 18 | Form 1040, Individual Income Tax Return | 2012 | Paper Filed | Oct. 22, 2013 | Line 22 Total Income |
| 19 | Form 1040, Individual Income Tax Return | 2013 | Electronically Filed | Oct. 15, 2014 | Line 22 Total Income |
| 20 | Form 1040, Individual Income Tax Return | 2014 | Electronically Filed | Oct. 14, 2015 | Line 22 Total Income |
| 21 | Form 1040, Individual Income Tax Return | 2015 | Electronically Filed | Oct. 16, 2016 | Line 22 Total Income |
| 22 | Form 1040, Individual Income Tax Return | 2016 | Electronically Filed | Oct. 16, 2017 | Line 22 Total Income |

In violation of Title 26, United States Code, Section 7206(2).

## FIRST NOTICE OF FORFEITURE

## THE GRAND JURY FURTHER CHARGES THAT:

1.      As a result of the violation(s) of Title 18, United States Code, Sections

1343 and 1346, set forth in this indictment, defendants

### ABDUR RAHIM ISLAM,
### SHAHIED DAWAN,
### KENYATTA JOHNSON, and
### DAWN CHAVOUS

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to such property, including, but not limited to, the sum of

$463,000.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendant(s):

    (a)     cannot be located upon the exercise of due diligence;

    (b)     has been transferred or sold to, or deposited with, a third party;

    (c)     has been placed beyond the jurisdiction of the Court;

    (d)     has been substantially diminished in value; or

    (e)     has been commingled with other property which cannot be divided without
            difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant(s) up to the value of the property subject to forfeiture.

    All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States

Code, Section 981(a)(1)(C).

- 40 -

## SECOND NOTICE OF FORFEITURE (RICO FORFEITURE)

1.      As a result of the violation of Title 18, United States Code, Section 1962(d) set

forth in this Indictment, the defendants,

**ABDUR RAHIM ISLAM, and**
**SHAHIED DAWAN,**

shall forfeit to the United States of America:

(a)      any interest acquired and maintained in violation of Title 18, United States Code,

Section 1962;

(b)      any interest in, security of, claims against, or property or contractual rights of any

kind, which afford a source of influence over, any enterprise established,

operated, controlled, conducted, and participated in the conduct of such violation

of Title 18, United States Code, Section 1962(d), and

(c)      any property constituting or derived from proceeds obtained, directly and

indirectly, from racketeering activity, in violation of Title 18, United States Code,

Section 1962, which property is subject to forfeiture to the United States pursuant

to Title 18, United States Code, Section 1963(a)(3).

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendant(s):

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without

        difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to

seek forfeiture of any other property of the defendant(s) up to the value of the property subject to

forfeiture.

    All pursuant to Title 18, United States Code, Section 1963.

**A TRUE BILL:**

_____

**FOREPERSON**

JENNIFER ARBITTIER WILLIAMS
Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515.

*No.* _ _ _ _ _ _ _ _ _ _

## UNITED STATES DISTRICT COURT
Eastern District of Pennsylvania

Criminal Division

### THE UNITED STATES OF AMERICA

vs.

**ABDUR RAHIM ISLAM**
**SHAHIED DAWAN**
**KENYATTA JOHNSON**
**DAWN CHAVOUS**

### INDICTMENT

Counts

**18 U.S.C. § 1962(d) (RICO conspiracy – 1 count)**
**18 U.S.C. §§ 1343, 1346 (honest services wire fraud – 8 counts)**
**18 U.S.C. § 1952(a)(3) (use of interstate facility to further racketeering – 1 count)**
**18 U.S.C. § 1343 (wire fraud – 6 counts)**
**26 U.S.C. § 7206(2) (false tax returns – 6 counts)**
**18 U.S.C. § 2 (aiding and abetting)**
**Notices of Forfeiture**

A true bill.

_____
Foreman

Filed in open court this _____ _____ day.
Of _____ A.D. 20 _____

_____
Clerk

Bail, $ _____