**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 20-45 |
| ABDUR RAHIM ISLAM | : | |
| SHAHIED DAWAN | | |
| KENYATTA JOHNSON | : | |
| DAWN CHAVOUS | | |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, by and through its attorneys, Jennifer A. Williams, United States Attorney for the Eastern District of Pennsylvania, and Eric L. Gibson, and Mark B. Dubnoff, Assistant United States Attorneys for the Eastern District of Pennsylvania, hereby submits this Trial Memorandum.

**I.      STATEMENT OF THE CASE**

**A.      The Indictment**

On January 28, 2020, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 22-count, 42-page indictment against Abdur Rahim Islam, the former chief executive officer and board president of Universal Community Homes ("UCH"); Shahied Dawan, UCH's former chief financial officer and secretary; Philadelphia City Councilman Kenyatta Johnson; and Johnson's wife, Dawn Chavous. The charges included conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), honest services fraud, wire fraud, and tax offenses. Islam is named as a defendant in all 22 counts. Dawan is a defendant in Counts 1 through 16. Johnson and Chavous are defendants in Counts 9 and 10.

Count One alleges that Islam and Dawan devised and participated in a RICO conspiracy involving Universal Companies ("Universal"), a Philadelphia-based enterprise comprised of UCH, which is a real estate development company, and Universal Education Companies ("UEC"), which provides academic services and operations for charter schools. The indictment alleges that Islam and Dawan conspired to conduct the affairs of Universal through a pattern of racketeering activity, which included acts of mail fraud, honest services mail fraud, wire fraud, honest service wire fraud, obstruction of justice, using an interstate facility in aid of racketeering, and bribery.

More specifically, Count One alleges that Islam and Dawan conspired to use Universal to, among other things: (a) bribe Johnson, through Chavous, in return for Johnson using his position as a Philadelphia City Councilman to take official actions to benefit Islam, Dawan, and Universal; (b) bribe Michael Bonds, a former president of the Milwaukee Board of School Directors ("MPS Board"), in return for Bonds using his position to take official actions to benefit Islam, Dawan, and Universal; (c) steal funds in the custody of Universal in order to support Islam's extravagant lifestyle; (d) steal funds from Universal to pay "bonuses" and other moneys to Islam and Dawan; (e) hide the thefts and bribe payments by creating sham contracts, invoices, and false entries in Universal's books and records; and (f) obstruct justice by withholding records and documents subject to legal process.

With regard to the Philadelphia bribe scheme, Count One alleges that Islam and Dawan agreed to direct Universal to pay approximately $66,750 to Chavous for a low-show consulting job in exchange for Johnson using his City Council job to take official acts benefiting Islam, Dawan, and Universal. These acts included introducing and voting for spot zoning legislation related to the Royal Theater, a property formerly held by Universal, and blocking

reversion to the City of Philadelphia of another property held by Universal that Universal failed to develop pursuant to an agreement with the City of Philadelphia.

With regard to the Milwaukee bribery scheme, Count One charges Islam and Dawan agreed to pay Bonds approximately $18,000, disguised as payments from Universal to an entity purporting to be a bookshop owned by Bonds, African American Books and Gifts, in exchange for Bonds taking a series of official actions advantageous to Islam, Dawan, and Universal. Those actions included advocating and voting for Universal's expansion of charter school operations in Milwaukee; introducing a motion for the MPS Board to lease MPS property to Islam, Dawan, and Universal; introducing a motion for the MPS Board to approve more favorable lease terms to the benefit of Islam, Dawan, and Universal; and voting in favor of the more favorable lease terms.

Count One also alleges that Islam and Dawan used their respective positions as CEO and CFO of Universal to pay themselves annual five-figure bonuses without the approval or knowledge of the Board, and to pay Islam excessive, inflated, or outright fraudulent reimbursements for "travel" and other purported "business expenses." Count One specifically alleges that Islam fraudulently sought and obtained, with Dawan's help, reimbursement for numerous personal expenses that he claimed were "business expenses," including personal car insurance, political contributions, personal vacations, and gym memberships. Islam and Dawan also allegedly authorized Islam to receive per diems or "pocket money" from UCH, well above Islam's documented earnings. In total, Islam and Dawan are accused of embezzling approximately $463,000 from Universal.

Counts 2 through 7 allege that Islam and Dawan committed honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, in connection with the scheme to bribe Bonds.

The charges identify six emails transmissions that were used to facilitate the bribery scheme: a September 26, 2015 email from Islam in Pennsylvania to Bonds in Wisconsin, relaying instructions from Dawan, including detailed figures and amounts relating to lease deferments sought by Universal from MPS (Count 2); a September 28, 2015 email from Universal's office in Wisconsin to Islam and Dawan in Pennsylvania, transmitting an invoice from African American Books and Gifts for $2,500 (Count 3); an October 20, 2015 email from Universal's office in Wisconsin to Islam and Dawan in Pennsylvania, transmitting an invoice from African American Books and Gifts for $1,500 (Count 4); a November 26, 2015 email from Universal's office in Wisconsin to Islam and Dawan in Pennsylvania, transmitting an invoice from African American Books and Gifts for $1,500 (Count 5); a December 30, 2015 email from Universal's office in Wisconsin to Islam and Dawan in Pennsylvania, transmitting an invoice from African American Books and Gifts for $1,000 (Count 6); and an April 21, 2016 email from Universal's office in Wisconsin to Islam and Dawan in Pennsylvania, transmitting an invoice from African American Books and Gifts for $1,500 (Count 7).

Count 8 charges Islam and Dawan with using an interstate facility to further racketeering activity (i.e., violating the Travel Act), in violation of 18 U.S.C. § 1952(a)(3). The "interstate facility" in this count is Universal's email server, which was located in Universal's administrative offices in Philadelphia.

Counts 9 and 10 charge all four defendants with honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and are based on specific allegations that Islam and Dawan bribed Johnson, through Chavous, in return for Johnson using his office to deliver a stream of benefits for Islam, Dawan, and Universal. The alleged wire fraud predicates are an October 16, 2014 email from Dawan to Islam, which forwarded a draft ordinance to change the

zoning for the Royal Theater (Count 9); and an October 22, 2014 transmission by Wells Fargo Bank from a branch in Philadelphia to an out-of-state server of an electronic image of a check from Universal to Chavous Consulting, for $17,250 (Count 10).

Counts 11 through 16 charge Islam and Dawan with wire fraud, in violation of 18 U.S.C. § 1343, and are based on the allegations that they defrauded Universal out of nearly a half-million dollars in unauthorized bonuses, expense reimbursements, and "pocket money."

Counts 17 through 22 charge Islam with six counts of filing false tax returns, in violation of 26 U.S.C. § 7206(20. They allege that Islam filed false personal tax returns for each tax year from 2011 through 2016, and underreported his taxable income by approximately $551,202, which resulted in a tax loss to the government of approximately $188,764.

**B.    The Bifurcation of the Trial**

On January 29, 2021, this Court granted a joint motion for severance filed by defendants Johnson and Chavous and ordered that Counts 9 and 10 would be tried separately from the other 20 counts. ECF No. 77. In an accompanying memorandum, the Court wrote that all defendants were "properly joined in this case," but Counts 9 and 10 must be severed from the remaining counts in the indictment to ensure that the jury considering whether Islam and Dawan bribed Johnson, does not hear the evidence that Islam and Dawan also bribed Bonds.

On October 14, 2021, the Court entered an Order stating that it would accept a proposal by the government to hold a bifurcated trial in front of a single jury "with all four defendants tried first on Counts 9 and 10, followed by a continuation of the trial before the same jury on the remaining Counts." ECF No. 108 at 4-5. The government had indicated in its proposal that it would not seek to offer evidence of the Bonds bribe or Islam's tax evasion in Phase One of the trial.

On January 4, 2022, the government and the defendants filed multiple motions *in limine* that sought to clarify which evidence could be presented in Phase One of the bifurcated trial, and which evidence had to be withheld until Phase Two. On February 18, 2022, this Court issued an Order stating:

> To prove motive, the Government may present evidence of Universal's financial status, to include financial problems stemming from its undertakings in Milwaukee. The Government may also present evidence as to Defendants Islam and Dawan's personal financial interest in having Universal survive and succeed, to include the introduction of specific amounts of money received by them from Universal's accounts. The Government shall not in Phase I introduce evidence that any such payments were unlawfully obtained or received. Nor shall the Government introduce any further evidence under Federal Rule of Evidence 404(b).

ECF No. 200 at 2, ¶ 5.

Phase One of the trial is currently scheduled to begin on March 21, 2022. When it is completed, the government will present the same jury with evidence relating to Phase Two.

## II.  STATEMENT OF FACTS THE GOVERNMENT WILL PROVE AT TRIAL

### A.  <u>Phase One</u>

#### 1.  <u>General Background</u>

Universal Community Homes ("UCH"), founded in or around 1993, is a non-profit organization founded by legendary music producer Kenny Gamble, with a mission of redeveloping residential and commercial properties into affordable housing in Philadelphia. Although Gamble was the founder of UCH, defendant Islam oversaw all day-to-day operations of the entity as its Chief Executive Officer prior to this indictment. Defendant Dawan, meanwhile, oversaw all of UCH's financial operations as its Chief Financial Officer. In 2002, Gamble, Islam, and Dawan founded a related non-profit entity, which they called Universal Education Companies ("UEC"), to provide academic services and operations management for primary and secondary charter schools. As with UCH, Gamble served as UEC's figurehead and

ambassador, but Islam was the CEO, and Dawan was the CFO. Collectively, UCH and UEC were often referred to as "Universal," although Universal is not a registered corporate entity.

Universal's office is located at 800 South 15th Street in Philadelphia. Univeral has a Board of Directors, which at all relevant times included Gamble, Islam, Dawan, and Gamble's wife, Faatimah Gamble.[1] Other people have sat on the board at various times over the past two decades. The Board is supposed to meet once a quarter at Universal's corporate office, but the meetings tended to be more sporadic for much of the time covered by the indictment.

Over time Gamble, Islam, and Dawan formed two other real estate development entities: Universal Real Estate Development Corporation ("URED") and One Real Estate Development LLC ("ORED"). Unlike UCH and UEC, URED and ORED were established as for-profit entities. URED's articles of incorporation identified Gamble as its sole shareholder, but in operation, URED's profits were split among Gamble, Islam, and Dawan. ORED was legally organized as a partnership between Gamble (who had a 65 percent stake) and Islam (35 percent). In 2016, Islam filed paperwork to become sole owner of ORED.

The Philadelphia City Council is the legislative arm of Philadelphia's municipal government. The Council consists of 17 members, each of whom is elected to serve a four-year term. The City is divided into ten distinct councilmanic districts. Ten of the 17 Councilmembers are elected by the districts in which they live; the other seven are elected at-large. Defendant Johnson was elected to represent Philadelphia Second City Council District in 2011 and was re-

---

[1] Neither Kenny Gamble nor Faatimah Gamble are accused of engaging in any criminal activity. As detailed below, they are both potential witnesses in this case. They also could be described as victims of Islam and Dawan's theft and embezzlement of funds from Universal, URED, and ORED.

elected in 2015 and 2019. Universal, the Royal Theater, and the properties located at 1309-1313 Bainbridge Street are all located in Councilman Johnson's District.

In December 2011, Johnson married defendant Chavous. Johnson and Chavous had met each other when they both worked in the office of Pennsylvania State Senator Anthony Hardy Williams, where Chavous was Chief of Staff. In 2010, Chavous formed Chavous Consulting, LLC ("Chavous Consulting"), which she marketed as an entity that provides a variety of services for its clients, including issue advocacy, fundraising for political campaigns or non-profits, planning events, developing strategic plans and objectives for organizations. Chavous also has worked as Executive Director of Student First Pennsylvania ("Students First"), a pro-charter school policy advocate group.

All four defendants are highly trained and/or sophisticated in matters relating to finance and/or Pennsylvania politics. According to a biography posted on Universal's website, Islam is a graduate of LaSalle University with dual degrees in accounting and finance. Islam also is a Certified Public Accountant ("CPA") and holds a Pennsylvania real estate license. Dawan graduated from Drexel University with a degree in accounting. Dawan is also a CPA, and prior to working for Universal, he was an Auditor and Regional Assignment Manager with the United States General Accounting Office.

Johnson is a graduate of Mansfield University and received a master's degree in government administration from the University of Pennsylvania's Feis Institute of Government. Prior to becoming a City Councilman, Johnson was a Pennsylvania State Representative. As a public official, Johnson has received recurrent training on Pennsylvania ethics laws that govern the behavior of public officials. Chavous is a veteran of city and state politics. In addition to serving as Senator Williams' chief of staff, she also has managed several of his political

8

campaigns as well as those for her husband. She is also very familiar with laws governing public officials.

### 2.   Islam and Dawan's Compensation from Universal

Islam and Dawan controlled the finances for Universal, and they exercised this control to pay themselves annual salaries exceeding $150,000 and to award themselves substantial bonuses without the knowledge or approval of Universal's Board of Directors. Islam, with Dawan's help, also received "reimbursements" for claimed "business expenses" that approached and sometimes exceeded $100,000 a year. Additionally, Islam, with Dawan's help, received large sums of "pocket money" from Universal, which started at $50 per week and increased to $100 per week in July 2014. Islam, with Dawan's help, also received $100 per day whenever he claimed to be traveling for Universal, even though he was simultaneously being "reimbursed" for documented expenses, such as meals, on the same trips.

The following table summarizes the compensation Islam received from Universal from 2011 through 2017:

| Year | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|------|------|------|
| Wages | $164,000 | $164,000 | $164,000 | $164,000 | $170,308 | $217,461 | $204,000 |
| Bonus/Pay Increase Differential | $35,000 | $35,000 | $35,000 | $50,000 | $45,000 | $0 | $0 |
| Expense Reimbursements | $100,000 | $64,904 | $160,779 | $166,146 | $135,473 | $178,027 | $45,000 |
| Total | $299,000 | $263,904 | $359,779 | $380,146 | $350,781 | $395,488 | $249,000 |

Islam also controlled the finances of URED and ORED and received distributions and "expense reimbursements" from both companies. Between 2011 and 2016, Islam received "expense reimbursements" from ORED that exceeded $140,000 and reimbursements from URED that exceeded $88,000. Neither URED nor ORED had any meaningful business activity during that time that would have warranted the magnitude of those business expenses.

###### 3.      Universal's Expansion into Milwaukee

In or around 2012, Islam and Dawan decided to try to expand UEC's charter

school operations into Milwaukee, Wisconsin. At the time, UEC had operated only in

Philadelphia, and members of Universal's Board of Directors expressed concerns about the

financial viability of an expansion into Milwaukee. Islam decided to push for the expansion

anyway.

The Milwaukee Public Schools ("MPS") are governed by a Board of Directors,

consisting of nine publicly elected directors who serve four-year terms. In order for a charter

school operator to contract with MPS, the operator typically must achieve two things: receive

charter and/or school approval by the MPS Board; and obtain a facility to host the school. In or

about August 2012, the MPS Board approved a proposal by UEC to operate a charter school in

Milwaukee. On or about August 30, 2012, the MPS Board approved the start of negotiations to

create an entity called Universal Academy for the College Bound ("UACB"), which would

operate charter schools in Milwaukee and negotiate terms of the charter contract.

###### 4.      The Royal Theater

The Royal Theater, located on the 1500 block of South Street in Philadelphia, was

a center of African-American culture in the middle of the 20th Century. Built in 1919, the Royal

Theater had once featured some of the country's most renowned musicians, including Fats

Waller, Betsie Smith, Cab Calloway, and Billie Holliday and had served as a movie-house for

films featuring African American actors. In 1970, however, the Royal Theater closed its doors as

a result of dwindling attendance. The building, which included a historic façade, was deemed a

landmark protected from demolition by the Preservation Alliance for Greater Philadelphia.

In 2000, UCH acquired the Royal Theater from the Preservation Alliance for approximately $286,252.00. At the time, UCH planned to stabilize the building and develop it as an anchor property for a new cultural district on South Street. UCH, however, was unable to develop the theater for that purpose. In 2008, UCH explored alternative uses for the property, including converting it a mixed commercial-and-residential building. Three years later, UCH presented a mixed-used proposal to a neighborhood civic organization of businesses, professionals, and residents, but the association opposed it.

In 2010, Universal applied to the state for a $4 million grant under the Pennsylvania Redevelopment Assistance Capital Program ("RACP") to demolish the theater, except for its historic façade on South Street, and replace it with commercial and residential units. The state approved a $2.25 million grant in 2011 but held it for review.

On January 26, 2012, while a new governor's administration was considering Universal's application for reissuance of the grant, the City of Philadelphia Department of Licenses and Inspections sent a Violation Notice to Universal, stating that the Royal Theater was "unsafe" and in violation of multiple city ordinances. The notice warned that if Universal failed to remedy the violations within 30 days, the City might demolish the theater. Islam and Dawan pleaded with elected officials for help obtaining the RACP grant so they could demolish and redevelop the theater.

On February 7, 2012 the state approved the release of a $2.25 million RACP grant for Universal to proceed with its plans for the Royal Theater. Universal, however, needed a permit from the Philadelphia Historical Commission in order to demolish any part of the building. In June 2012, Universal applied for such a permit, but that application was denied: Universal was told it would have to try to sell the property, and only if those efforts failed, could

it re-apply to the Historical Commission for a permit to demolish the theater. Universal listed the Royal Theater for sale in the summer of 2012. Although it received multiple bids, most were contingent on Universal obtaining a change in the zoning laws applicable to the Royal Theater. Universal did not sell the Royal Theater at that time.

### 5.    1309-1313 Bainbridge

Another real estate asset in Universal's portfolio in 2012 was a parcel (actually three parcels) located at 1309-1313 Bainbridge Street in Philadelphia (the "Bainbridge Street" parcels). The Redevelopment Authority of the City of Philadelphia ("RDA") had conveyed the Bainbridge Street parcels to Uni-Penn Homeownership, Inc. ("Uni-Penn"), a partnership of UCH and the Pennsylvania Housing Authority (the "PHA") on January 27, 2005 for a total of $3, for the purpose of building 109 single-family units on the land.

Under the contract, Uni-Penn was supposed to begin construction on the project in April 2005 and complete it within 18 months, or by October 2006, or face the prospect of "reversion," whereby the PRA could re-claim ownership of the parcels. As of early 2013, the Bainbridge Street parcels remained undeveloped. The property also was strewn with trash and the subject of neighbors' complaints about vandalism, graffiti, and drug dealing.

### 6.    Universal's Financial Situation in Late 2012/Early 2013

By the end of 2012, Universal was in poor financial shape, largely as a result of its planned expansion into Milwaukee. On December 3, 2012, Dawan sent an email to Islam which stated that "cash has really taken a hit especially in the first half of this fiscal year." Dawan referenced several consulting agreements and asked Islam whether he wanted to continue them. Islam directed Dawan to cut nearly all of the consultants out of Universal's budget.

On January 28, 2013, Dawan emailed Islam that Universal would need a loan of at least $2.5 million to get through its first year of operations in Milwaukee. On February 4, 2013 Dawan sent Islam an email referencing the elimination of consultants at UCH and the need to cut additional expenses. On February 22, 2013, Dawan sent an email to Islam stating that UCH was projected to lose $200,000 by the end of the fiscal year "or we can wait to see if we sell the royal within the next 30 days and easily cover the deficit in Real Estate."

On March 12, 2013, Universal received a "Right to Cure" letter from the governor's office, warning that the RACP grant for the Royal Theater would be revoked if certain conditions were not met within 30 days, one of which was obtaining the permit from the Historical Commission. On March 14, 2013, Universal pulled the Royal Theater off the real estate market. A few days later, Universal submitted a new application to the Historical Commission for a permit; that application was denied as well.

Meantime, Islam tried to find a partner to help Universal develop the Royal Theater and the Bainbridge Street parcels. He reached out to local developer Carl Dranoff, who expressed an interest in helping to develop the Royal Theater. Dranoff and Islam discussed the fact that any plan to redevelop the Royal Theater would require both a permit from the Historical Commission and a change in the zoning code applicable to the theater.

On April 3, 2013, Dawan and another Universal employee discussed the fact that every UEC school had exceeded its budget and they had to cease all spending for the rest of the fiscal year. Three days later, Islam asked one of his longtime business partners for a $25,000 loan (which Islam still has not paid back).

On April 11, 2013, Dawan emailed Islam that, "it's been a tough day," and that Universal's banks had expressed concerns about a 24-month stretch of losses, depleted cash

reserves, and increased expenses. Dawan wrote: "The reality is that we need to cut out all [non]essential expenditures at least for 6 months and reduce all [non]essential staff for the same period of time … We are out of cash!!!"

On April 14, 2013, Islam responded by suggesting further belt-tightening at Universal. The next day, Islam told his assistant that he needed to schedule meetings that week with both Johnson and Chavous.

### 7.   **Johnson and Chavous' Financial Condition in Early 2013**

At the time Islam and Dawan were struggling to keep Universal afloat, defendants Johnson and Chavous found themselves facing substantial debts, which were steadily growing. As of October 2012, the couple had at least three credit cards between them (an American Express, a Barclay Mastercard, and a Wells Fargo Visa card), which had a combined balance of approximately $22,461.70. That figure increased to approximately $32,978.66 in January 2013, $37,640.40 in February 2013, $39,042.98 in March 2013, and $40,931.00 in April 2013. These monthly balances included hundreds of dollars in interest charges alone. Johnson and Chavous also had separate mortgages for both their marital residence and a house that Chavous owned prior to marrying Johnson.

The defendants did not have enough money in their bank accounts to pay for all their expenses. Chavous regularly incurred overdraft charges on her primary checking account because she withdrew more money than she had: this happened approximately 50 times between January 2013 and June 2015 and cost Chavous approximately $867.50.

Both Johnson and Chavous earned substantial incomes, according to their tax filings, but their expenditures were outpacing their earnings.

### 8. Universal's First Contract With Chavous Consulting

On April 17, 2013, Islam met with Kenyatta Johnson. On either April 18 or April 19, 2013, Islam met with Chavous. These meetings occurred less than a week after Dawan had written to Islam to report that Universal's banks were concerned and that they were "out of cash!!!" They also occurred in the midst of Islam's efforts to: (a) reach an agreement with Dranoff to develop the Royal Theater, which depended on the Historical Commission permit and zoning code relief, and (b) reapply to the Historical Commission for a permit to demolish most of the theater.

On May 1, 2013, Chavous sent an email to Islam, to which she attached a proposed consulting contract between Universal Companies and Chavous Consulting. The contract, which Islam and Dawan signed on May 11, 2013, and backdated to May 1, 2013, stated that Universal Companies would pay $3,500 a month to Chavous Consulting to "help promote business opportunities for Universal Companies." The contract further provided that Chavous would do no more than 20 hours of work a month for Universal.

Dawan emailed the signed contract back to Chavous on May 14, 2013. Chavous did not immediately do any discernible work for Universal.

### 9. The Act 135 Filing

On or about May 20, 2013, Juan Levy, a neighbor of the Royal Theater, filed an action under Pennsylvania's Blighted and Abandoned Properties Conservatorship Law of 2008 ("Act 135") to award conservatorship to local developer Ori Feibush.  According to Act 135, a "Party in Interest," an owner, lien holder, or resident or business owner within 500 feet of a property that has met certain criteria regarding neglect and detrimental conditions may petition the Pennsylvania Court of Common Pleas to appoint a Conservator to take possession and

effectuate the necessary rehabilitation and management of the property. An Act 135 may result in a property owner losing control and ownership rights of the property with little to no compensation if they do not act promptly to save their property from Conservatorship. Thus, the filing of the Act 135 in this case threatened to strip Universal of its ownership of the Royal Theater. On May 24, 2013, the Court scheduled a status conference on the Act 135 for July 22, 2013.

While this was going on, Universal was continuing to suffer increased financial hardship. On May 21, 2013, Dawan announced that four Universal employees were be laid off because of "budget savings strategies." At roughly the same time, Islam arranged for a political fundraiser for Johnson to be co-hosted by Dranoff. The fundraiser was scheduled for June 4, 2013. On June 3, 2013, Islam, Dranoff, and Dawan agreed to meet before the next day's fundraiser so they can discuss how to proceed with their plans to redevelop the Royal Theater.

The fundraiser generated approximately $25,000 for Johnson.

### 10.   Universal's Second Contract With Chavous

On June 5, 2013, the day after the political fundraiser for her husband, Chavous sent a new proposed contract to Dawan and Islam. There was a slight difference in the way the contemplated consulting work was described in the two contracts, but in both agreements, Chavous was to provide no more than 20 hours of work each month for Universal Companies. There was, however, one big change: now, Chavous was seeking $4,500 per month. Islam and Dawan both signed the new contract with Chavous Consulting, even though Universal continued to lose money, in part because of its expansion into Milwaukee.

At roughly the same time, Universal learned that the Historical Commission had denied yet another application for a permit and that the state of Pennsylvania was rescinding the award of the RACP grant. Chavous did no discernible work for Universal in June 2013.

### 11.   Chavous' "Work" for Universal

On July 1, 2013, Chavous tried to do something to benefit Universal, but it had nothing to with fundraising or promoting charter schools. Instead, she set up a meeting among Islam, her husband, state Senator Williams, and state Representative Jordan Harris, so that they could all discuss the Royal Theater and the Act 135. After the meeting, defendant Islam told Dranoff that defendant Johnson and the other politicians had agreed to "fully support us with the Royal." Islam also told Dranoff: "Kenyatta will take the lead with the Mayor (he will also work with us on Zoning, Historical, and [reapplying for an RACP grant]."

Chavous did no other discernible work for Universal in July 2013. Indeed, she spent approximately half the month on a trip to Israel which she organized, along with defendants Johnson and Islam and several other people who had been invited by Chavous.

Nonetheless, on August 1, 2013, Chavous sent an invoice to Dawan and Islam, in which she sought $13,500 for three months of work. Chavous also wrote that her original contract was for a three-month period and asked if Universal wanted to renew her contract for another three months. On August 2, 2013, Islam and Dawan signed a check drawn on a UCH bank account for $13,500, made payable to Chavous Consulting.

Neither Islam nor Dawan responded to Chavous' question about renewing her contract, but on September 24, 2013, Chavous sent an email to Dawan attaching a new invoice for August 2013 and stating that Islam had orally agreed to keep her on for a year, until May 2014. Chavous appears to have organized one meeting in August 2013 for the purpose of

planning a 20th Anniversary celebration for Universal, but she did no other discernible work during that time. The celebration also never happened. Nonetheless, Islam and Dawan directed Universal to pay $4,500 for her August "work."

Over the next year, Chavous sent three more invoices to Universal for services supposedly rendered by Chavous Consulting, and in return, Islam and Dawan directed UCH to pay three more checks to Chavous Consulting: a check dated January 2, 2014 for $18,000; a check dated May 12, 2014 for $13,500; and a check dated October 10, 2014 for $17,250. In total, Chavous received five checks with a total value of $66,750 from Universal.

Notably, Chavous kept sending invoices to Universal even after May 2014, when her oral agreement with Islam supposedly ended. Even more notably, Chavous produced little, if any, discernible work product for Universal during the 16 or 17 months when she claimed to have worked for Universal.

Islam, in an interview with federal agents, said he hired Chavous to be a fundraiser, and she did not raise any funds. Dawan initially told federal agents that he had no recollection of what Chavous had done for Universal. Dawan then testified in the grand jury that Chavous was hired to do public relations work to promote Universal's agenda with regard to charter schools. Several members of Universal's Board said they did not even know Chavous had been hired by Universal, let alone what she supposedly did for Universal. Numerous Universal employees have said they do not know of any work that Chavous did for Universal. Chavous' only employee, Portia Fullard, could barely remember any work that Chavous Consulting did for Universal.

Even Chavous, herself, could not produce many documents reflecting work she did for Universal, in response to a subpoena for such records. She appears to have made a few

telephone calls, written a handful of emails, and attended a few meetings that are arguably related to fundraising for Universal. But at most, that "work" could not have taken her more than 30-40 hours over her entire tenure with Universal to complete.

### 12.    Johnson's Official Acts Related to the Royal Theater

The real value that Chavous provided to Universal, Islam, and Dawan was that she was married to Johnson. Just as Islam had assured Dranoff in the July 11, 2013 email, Johnson did take the lead on getting the necessary zoning approvals for Universal's redevelopment plans for the Royal Theater.

There are essentially two methods to obtain changes in the zoning rules applicable to Philadelphia properties. The first and more traditional method is to apply for a "variance" to the Zoning Board. A hearing before the Board is a lengthy process and provides the local community with the opportunity to influence the ultimate decision. If the proposed variance does not receive local community support, the Zoning Board may reject it. Moreover, even if the Board approves a variance, members of the local community can appeal the decision. The appeals process is time consuming, costly, and could be detrimental to the proposed development.

The second method to obtain a zoning variance in Philadelphia is to get a spot-zoning ordinance proposed via legislative act. A proposal for spot-zoning legislation is typically conveyed by a Councilperson to the City of Philadelphia Law Department and Planning Commission which then drafts legislation that reflects the Councilperson's intent and support. Spot-zoning ordinances are a way to circumvent the lengthier process before the Zoning Board.

Universal and Dranoff's proposal for redeveloping the Royal Theater was not well received by people who lived in the immediate vicinity of the property, and it became clear

19

to all concerned parties that if Universal went the more traditional route for a variance and applied to the Zoning Board, there would have been a long drawn-out fight, and the outcome would have been uncertain. Johnson then agreed to introduce a spot-zoning ordinance to change the zoning for the Royal Theater.

Dranoff and Feibush knew of Johnson's decision no later than August 10, 2014, when they discussed it by email. Notably, Chavous was still on Universal's payroll at this time. Indeed, Chavous did not send her final invoice to Universal until September 21, 2014. By that time, Johnson's plans to introduce spot-zoning legislation regarding the Universal Theater were already public. Dranoff had announced that decision on September 10, 2014, at a neighborhood meeting to discuss the redevelopment plan. Johnson staffer Steve Cobb attended that meeting on behalf of Johnson. Nobody had told either Dranoff, Feibush, or Cobb that Chavous had a contract with Universal and was receiving money from Universal at that time.

Lawyers representing Dranoff's company actually drafted the zoning ordinance that he and Universal wanted Johnson to introduce to the City Council. On October 15, 2014, Dawan sent an email to Islam, stating that they needed to "meet with Kenyatta Johnson ASAP to get him to introduce our resolution." The next day, an associate of Dranoff emailed a draft of the proposed ordinance to Dawan, who forwarded it to Islam.

On October 22, 2014, Chavous deposited the final check she received from UCH into an account for Chavous Consulting. The next day, October 23, 2014, she transferred thousands of dollars out of that account into her personal account and used thousands of other dollars to pay her personal credit card bills. Also on October 23, 2014, Johnson attended an ethics refresher course for public officials where he was reminded that state law prohibits public officials and employees from doing official acts that affect their personal financial interest.

On October 30, 2014, Johnson introduced the zoning ordinance to the City Council. He did not disclose that his wife had been a consultant for Universal, and he did not recuse himself from participating in any discussions or votes on the proposed ordinance.

On December 11, 2014, Johnson voted for the ordinance. Again, he did not tell anyone at City Hall about his wife's connection to Universal.

In June, 2015, Johnson sent two representatives from his office – Steve Cobb  and Peter Elliott – to meetings of the Philadelphia Historical Commission, which was considering Universal's petition for financial hardship in support of their request for a permit to demolish the Royal Theater. Both Cobb and Elliott told the Historical Commission that Councilman Johnson supported Universal's hardship application. The Committee on Financial Hardship unanimously approved Universal's application. The Historical Commission then granted Universal the permit to proceed with the partial demolition of the theater.

As it turned out, Dranoff wound up backing out of the plan to redevelop the Royal Theater, which prompted Islam and Dawan to try to sell it. On or about September 27, 2016, UCH sold the Royal Theater to a Florida developer for $3.7 million. UCH received more than $2,700,000.00 in net profit from the sale, after the payment of settlement and closing costs, real estate taxes, and consulting fees.

### 13.   Johnson's Official Acts Related to the Bainbridge Properties

In addition to using his position as a City Councilman to help Universal get a change in the zoning law and a permit from the Historical Commission, Johnson also used his office to help Universal retain ownership and control of the Bainbridge Street Properties. Johnson pulled this off by using "Councilmanic Prerogative."

In Philadelphia, "Councilmanic Prerogative" is a legislative practice through which individual City Councilpersons influence nearly all of the land use decisions in their district. When invoked by a Councilperson to support or reject a development proposal, the use of the prerogative is almost always honored by the rest of the Council.

In late 2013 and early 2014, the RDA began making plans to revert the Bainbridge Street parcels, because Uni-Penn had failed to develop them as was required under the Redevelopment Agreement. Brian Abernathy, the Executive Director of the RDA, contacted Johnson to seek his support for the reversion. Although Johnson's support was not legally required to begin the reversion process, it was needed as a practical matter, because of Councilmanic Prerogative.

On January 16, 2014, Chavous sent an email to Islam at 10:13 p.m., which she labeled "Urgent" in the subject line. Chavous wrote:

Hi Rahim

I have some intell [sic] I need to discuss with you regarding 2 urgent matters.

1) NAC (neorborhood [sic] advisory committee) Office

2) Properties the City wants to take from you located at 13th and Bainbridge.

Please let me know when we can talk.

Thanks,
D

Shortly thereafter, Johnson told Abernathy that he would not support the reversion. According to Abernathy, Johnson's refusal to support the reversion had a "chilling effect" and halted the Redevelopment Authority's attempted reversion. As of 2015, the Bainbridge Street parcels were valued at between $2.6 million and $3.5 million, and they remained under the partial control of Universal as a result of Johnson's official acts.

22

14.     **The Defendants All Benefited From the Bribery Scheme**

All four defendants benefited from the bribery scheme. Johnson and Chavous were the most immediate beneficiaries. Their bank and credit card records reveal that they were quite dependent on the Universal payments to Chavous Consulting just to make ends meet. Every time Chavous received one of the checks, she deposited it into a Chavous Consulting bank account and immediately transferred large portions of the funds to a personal bank account and to her creditors. Without these funds, Chavous and Johnson likely would have been unable to make all of their mortgage, loan, and credit card payments. Even with the payments from Universal, Chavous and Johnson had sizeable debts, and as soon as the payments stopped, Chavous and Johnson found themselves in dire need of money again. In late 2014 and early 2015, Chavous asked family members and longtime friends for financial assistance.

Islam and Dawan also benefited from the scheme because they were able to convert the Royal Theater into a cash windfall for Universal. That meant that both Islam and Dawan could continue earning substantial salaries and bonuses from Universal, and Islam could keep bleeding Universal to pay for more than $100,000 in annual "expense reimbursements" and per diems.

15.     **Efforts to Obstruct Justice**

Defendants Islam and Chavous also took steps to obstruct this criminal investigation. Islam only partially complied with grand jury subpoenas for documents relating to this case, which forced the government to have to obtain and execute search warrants in order to find the documents. Chavous, meanwhile, deleted all of her 2012 and 2013 emails sometime after learning that her husband was under investigation. Among the emails Chavous destroyed were all of her 2013 emails with Islam, Dawan, and anyone else associated with Universal.

23

Chavous tried to explain her actions by saying she had reached her email storage limit, but she notably retained her emails from 2010 and 2011 as well as some large email files. The government expects the evidence to show that the reason Chavous destroyed her emails was because she had something to hide from law enforcement.

**B.** **Phase Two**

The government expects to present most of its evidence in Phase One of the bifurcated trial. There are, however, three categories of evidence that the government will not present to the jury until Phase Two: (a) evidence that the payments Islam and Dawan received from Universal for bonuses and claimed expense reimbursements were unlawfully obtained or received; (b) evidence that Islam and Dawan bribed Bonds; and (c) evidence that Islam intentionally filed false tax returns for tax years 2011 through 2016.

**1.** **The Fraudulent Nature of Islam and Dawan's Actions Toward UCH**

In Phase Two, the government intends to show that Islam repeatedly lied in the claims he submitted for business reimbursement expenses from Universal. For example, the evidence will show that Islam sought reimbursement from Universal for political contributions, and that many of the claims he submitted to Universal for expense reimbursements were excessive, inflated, or outright fraudulent. The evidence also will show that buried within Islam's actual expense reimbursement claims were bills for personal car insurance, personal vacations, and gym memberships for himself and immediate family members.

**2.** **The Bonds Bribery Scheme**

Whereas Johnson and Chavous came to Universal's rescue in Philadelphia, problems continued to mount in Milwaukee. On September 16, 2014, MPS directed UACB to explain the operational deficit to MPS to remain in compliance with the charter school contract

entered into in July 2013.  On September 22, 2014, Shaheed Dawan responded in a letter to MPS that poor student enrollment was to blame.

Despite these financial issues, in the fall and winter of 2013-2014, Islam continued to push for an expansion of Universal's charter school program in Milwaukee. In December 2014, Islam and Dawan sought to open a third UACB charter school in Milwaukee. They ran into some opposition on the MPS Board, but they found a potential ally in MPS Board President Michael Bonds. Islam and Dawan began paying bribes to Bonds, in the form of sham purchases of books, artwork, and media from "African American Books and Gifts," a business owned and operated by Bonds. In return, Bonds took official acts to benefit Islam, Dawan, and Universal.

For example, on December 9, 2014, Bonds attended a meeting of an MPS Board committee on which Bonds did not sit and advocated in support of Universal's request to open a third charter school in Milwaukee. The committee ultimately approved Universal's bid.

On December 11, 2014, Bonds brought a motion before a different committee in support of Universal's lease for an MPS facility to house the Lee Campus.  In another official act, Bonds voted in favor of his motion and it passed the committee with a recommendation to the full MPS Board to vote in favor of the lease agreement.

On December 18, 2014, Bonds presided over a meeting of the full MPS Board at which the expansion of the charter school operations sought by Islam and Dawan was approved by the full board. Bonds again voted in favor of Universal's proposals.

The next day, Islam directed his assistant in Milwaukee to forward an invoice from African American Books and Gifts to Dawan for a $5,000 purchase of books and dvds.

Over the next two years, Bonds took several additional official acts in favor of Islam, Dawan, and Universal, while receiving payments for large purchases of books and gifts. Most of the payments were made by Universal, but one was made by Islam personally, and two were made by URED.

The purchases are summarized in the following table.

| Date | Check # | Check Amount | Account # | Originating Account Holder |
|------|---------|--------------|-----------|---------------------------|
| 12/24/2014 | #1962 | $ 2,000 | x6235 | Universal |
| 1/21/2015 | #170 | $ 3,000 | x3165 | Abdur-Rahim Islam |
| 2/18/2015 | #1053 | $ 2,000 | x6223 | Universal |
| 3/6/2015 | #1110 | $ 1,000 | x6223 | Universal |
| 4/1/2015 | #1149 | $ 1,000 | x6223 | Universal |
| 6/29/2015 | #1639 | $ 1,000 | x1145 | Universal |
| 9/28/2015 | #1847 | $ 2,500 | x1145 | Universal |
| 11/4/2015 | #1925 | $ 1,500 | x1145 | Universal |
| 11/30/2015 | #1062 | $1,500 | x536-7 | URED |
| 1/4/2016 | #1066 | $1,500 | x536-7 | URED |
| 4/22/2016 | #2212 | $ 1,000 | x1145 | Universal |

The official acts that Bonds took to benefit Universal, Islam, and Dawan, include that on April 19, 2016, at a subcommittee meeting of the MPS Board, Bonds motioned for approval of new lease terms favorable to Universal and its Milwaukee operation and then voted in favor of the lease deferment. Bonds never told anyone at the MPS Board about the payments from Universal, Islam, and Dawan to his bookstore.

Universal's entire foray into Milwaukee was a disaster for everyone associated with it. Universal lost money, and in the middle of the 2016-2017 school year, Universal terminated its contract to provide charter school services to MPS.  In a letter dated March 9, 2017, Penny Nixon, Superintendent of Schools for Universal Companies, stated the final day of operations would be April 7, 2017.

Vendor payment history shows that between 2013 and 2017, MPS paid Universal Companies approximately $26,000,000.00 to operate three charter schools in the Milwaukee area. Due to the school closings at the end of the 2017 school year, Universal Companies never repaid the deferred portion of the lease that was agreed upon between Universal and MPS in April 2016.

Bonds has pleaded guilty to his role in the bribery scheme and is expected to testify against Islam and Dawan at this trial.

### 3.     Islam's Tax Evasion

Over a six-year period, Islam, a CPA, prepared fraudulent joint federal income tax returns for him and his spouse. From 2011 through 2016, in the aggregate, Islam underreported his taxable income by approximately $551,202 resulting in a tax loss to the government of approximately $188,764.00.

Islam hid and underreported his income in a variety of ways, including the following:

- Through his control of Universal Companies, Islam and Dawan arranged for "bonus" payments to be generated outside of Universal's established payroll accounting system thereby ensuring the payments would not appear on his W-2s. Islam then treated the "bonus" payments as "Gross Receipts" from his Schedule C consulting business, URED. Islam then fraudulently reduced the income attributable to his Schedule C business by inflating or creating false and fictitious business expenses to offset against his "Gross Receipts," thereby reducing or eliminating any taxable income from his "bonuses."

- As CEO of Universal Companies, Islam was reimbursed for travel and business related expenses. Islam would pad any legitimate business expenses he submitted with a variety of personal expenses which should not have been reimbursed by Universal Companies. Dawan then approved the reimbursements and issued a check. For example, Islam was reimbursed for his personal car insurance, political contributions, personal vacations for himself and others, multiple gym memberships, and personal meals, including family celebrations. Islam did not include these personal expenses as income on his IRS Forms 1040.

## III.     THE EVIDENCE

### A.     <u>Witnesses</u>

The government may call the following witnesses at trial (presented largely in alphabetical order, not the order in which they may be called):

**Brian Abernathy** – Former Executive Director of Philadelphia Redevelopment Authority; sought reversion of Bainbridge Street properties.

**Richard Barnhart** – CEO of Pennrose; worked with Universal, ORED, Islam, and Gamble on real estate development projects.

**Michael Bonds** – Former president of Milwaukee Public School Board. Pleaded guilty to honest services wire fraud charges and is cooperating against Islam and Dawan.

**Fateen Anthony Bullock** – Former VP at Maximus, a former client of Chavous Consulting.

**George Burrell** – Former COO and member of Universal's Board of Directors.

**Steve Cobb**—Former aide to Councilman Johnson; oversaw zoning.

**Steve Cohen** – Former accountant for Councilman Johnson, Chavous, and Chavous Consulting.

**Michael Cooke** – Former director of enforcement, Philadelphia Board of Ethics.

**Ptosha Davis** – Chief of Staff for President of Milwaukee City Council; worked for Universal from 2013 until 2016.

**Wallace Dawan** – Son of defendant and former VP of Finance at Universal.

**Michele DiPietro** – Scheduler and special assistant to Councilman Johnson.

**Carl Dranoff** – Philadelphia-based real estate developer, who worked with defendants on plan to redevelop Royal Theater.

**Karen Dunkley** – Former consultant for Universal.

**Glenn Ellis** – Former member of Universal Board of Directors.

**Ori Feibush** – Real estate investor who sought to acquire Royal Theater; brought Act 135 action seeking conservatorship of Royal Theater; eventually purchased it.

**Amy French** – Forensic Accountant, FBI, who analyzed financial records of Universal, Islam, Johnson, Chavous. Possible summary witness.

**Portia Fullard –** Former employee of Chavous Consulting.

**Faatimah Gamble** – Wife of Kenny Gamble, member of Universal's Board of Directors.

**Kenneth Gamble** – Founder and face of Universal, URED, and ORED.

**Melissa Goins** – Traveling companion of Islam and beneficiary of numerous Universal payments for Islam's claimed expense reimbursements.

**Joel Greenberg** – Principal of Susquehanna International Group.

**Richard J. Haag** – Special Agent, FBI, one of the case agents.

**Jordan Harris** – Pennsylvania State Representative for district that included Universal and Royal Theater.

**Tamelia Hinson** – Executive VP at Universal; daughter of Faatimah Gamble and step-daughter of Kenny Gamble.

**William Hite** – Superintendent of the Philadelphia School District.

**Kelvin Jeremiah** – President and CEO of Philadelphia Housing Authority.

**Michael Johns** – Former Executive VP of Capital Projects for Philadelphia Housing Authority.

**Susan Joseph** – CPA for Universal who worked at Haefele Flanigan.

**Deena Kobell** – Neighbor of Royal Theater.

**Eve Lewis** – Universal's VP of development.

**Charles Lomax** – Former member of Universal Board of Directors.

**Robert McManigal** – Former FBI Special Agent.

**Richard Morgenstern** – CPA for Gamble who prepared tax returns for URED.

**Penny Nixon** – Senior Executive VP and Superintendent of Schools for UEC.

**Ray Ovelman** – Revenue Agent, IRS.

**Juanelia Roberts** – Scheduler and administrative assistant to Islam at Universal.

**Mark Sain** – President of Milwaukee School Board after Bonds.

**Christopher Sample** – Chief of staff for Councilman Johnson.

**Gregory Scott** – Former Special Advisor to Islam at Universal.

**Lisa Simmons** – Executive at Maximus, Inc., a former client of Chavous Consulting.

**Brian Sullivan** -- Retired treasurer and associate director of Susquehanna International Group.

**Chad Speicher** – Special Agent, FBI, one of the case agents.

**Jeffrey Spence** -- Former member of Milwaukee Public School Board.

**Gina Spang** -- Former Chief of Staff, Milwaukee Public Schools.

**Sharif Street** – Pennsylvania State Senator.

**Gregory Thorton** – Former chief academic officer of Philadelphia School District and superintendent of Milwaukee public schools.

**Ian Totani** – Special Agent, IRS, one of the case agents.

**Anthony Hardy Williams**, Pennsylvania State Senator.

B.    **Exhibits**

To the extent possible, the government will provide the Court and all defense

counsel with copies of the exhibits it intends to offer at trial, which will include the following:

1.    **Maps and Photographs**

The government intends to present the jury with demonstrative exhibits regarding

the geography of Philadelphia and its councilmanic districts, photographs of the Royal Theater,

and the lot at 1309-1313 Bainbridge Street.

### 2.   Universal Corporate Records

The government intends to present corporate records for Universal, including by-laws, articles of incorporation, and minutes from Board of Directors meetings.

### 3.   Universal Tax and Audit Records

The government intends to present tax and audit records for UCH, which were generated by Haefele Flanagan, along with related documents.

### 4.   Tax Records of Defendants Johnson and Chavous

The government intends to present tax records prepared by Morris J. Cohen & Co. for defendants Johnson and Chavous.

### 5.   Bank Records for Universal, Chavous Consulting, and the Defendants

The government intends to present records from multiple banks, including Wells Fargo, TD Bank, and Citizen Bank, including bank statements, deposit slips, checks, and other records for accounts owned and operated by Universal, URED, ORED, Chavous Consulting, and defendants Islam, Johnson, and Chavous.

### 6.   Credit Reports for the Defendants

The government intends to present credit reports for the defendants.

### 7.   Credit Card Statements and Other Loan Records

The government intends to present records of debts owed by the defendants, including but not limited to records from American Express, RBS Citizens Bank, Barclay Mastercard, Wells Fargo.

### 8.   Documents Regarding Bainbridge Street Property

The government intends to present records regarding the parcel of land located at 1309-1313 Bainbridge Street in Philadelphia, including records from the Philadelphia

Redevelopment Authority, Uni-Penn Homeownership, Inc., and emails concerning plans to either develop the parcel or revert it to the city.

### 9. Documents Regarding the Royal Theater

The government intends to present records reflecting the history of the ownership of the Royal Theater and efforts by Universal to obtain state funds to develop the property.

### 10. Emails From Universal

The government intends to present emails recovered from the servers of Universal, including emails concerning Universal's expansion into Milwaukee, its financial condition, efforts to develop or sell the Royal Theater, and the hiring of Chavous Consultants.

### 11. Records of Universal's Payments to Chavous Consulting

The government intends to present invoices transmitted from Chavous Consulting to Universal and the checks paid by Universal to Chavous Consulting.

### 12. Chavous Consulting Business Records

The government intends to present business records recovered from Chavous Consulting, including communications between and among the defendants, calendar entries, client lists, records of invoices and expense reimbursement claims.

### 13. Records Regarding the Investigation of the Case

The government intends to present subpoenas, the defendants' responses to them, and search warrants.

### 14. Transcript Excerpts

The government intends to present excerpts of transcripts of testimony relating to this case, including the grand jury transcript of defendant Dawan and the deposition testimony of a witness in the lawsuit that Feibush brought against Johnson.

### 15. **Immunity Lettes and Cooperation Agreement**

The government intends to present documents reflecting agreements it entered into with certain witnesses, including immunity agreements with Portia Fullard and Ptosha Davis, and a cooperation plea agreement with Bonds.

### 16. **Public Records from Philadelphia and Milwaukee**

The government intends to present public records from Philadelphia and Milwaukee, including records from the Philadelphia City Council meetings of October 30, 2014, and December 11, 2014; minutes from the Philadelphia Historical Commission; and recordings of four Milwaukee School Board meetings that were held between 2014 and 2016.

### 17. **Universal's Payments to Islam and Dawan**

The government intends to present record of the payments that Islam and Dawan received from Universal, URED, and ORED between 2011 and 2017, including wages, bonuses, expense reimbursements, distributions, and per diems.

### 18. **Documents Relating to Islam's Expense Claims**

The government intends to present the documentation that Islam submitted to Dawan in support of his claims for bonuses, expense reimbursements, and per diems, including Islam's American Express records, emails, and receipts. The government also intends to present the jury with records that Islam kept on his personal computer to support his claims for bonuses, expenses, and per diems.

### 19. **Text Messages Between and Among the Defendants**

The government executed search warrants for records from the cellular telephones of some of the defendants and intends to present some of the text messages recovered during thos searches.

20. **Payments to Bonds**

The government intends to present evidence of the payments that Universal, Islam, and Dawan made to Bonds, and communications among Islam, Dawan, and Bonds about such payments.

21. **Tax Records for Islam**

The government intends to present tax filings and supporting documents that relate to Islam's tax filings from 2011 through 2016.

22. **Summary Charts**

The government will seek to present several charts summarizing the aforementioned evidence, such as a timeline.

## IV.   ANTICIPATED TRIAL LENGTH

The government anticipates being able to put on its case-in-chief in Phase One in about three weeks.  The defendants have not provided an estimate of how long they will need to present their evidence. After the jury returns its verdict in Phase One, the government anticipates being able to put on its case-in-chief in Phase Two in approximately three or four trial days. Neither Islam nor Dawan have provided an estimate of how long they will need to present their evidence in Phase Two.

## V.   ELEMENTS OF THE OFFENSES

**18 U.S.C. § 1962(d) (RICO conspiracy)**

To obtain a conviction for conspiracy to violate RICO under 18 U.S.C. § 1962(d), the government would have to prove:

(1)   That two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of the affairs of an enterprise engaged in, or the activities of which affected interstate commerce, through a pattern of racketeering activity;

(2)   That the defendant was a party to or member of that agreement; and

(3)   That the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's

affairs through the pattern or racketeering activity, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

An **enterprise** may be: (1) a legal entity, such as a corporation or partnership or sole proprietorship or association; or (2) a union or group of individuals "associated in fact" although not a legal entity. The term "enterprise" includes both legitimate enterprises and also illegitimate or completely illegal enterprises.

An **association-in-fact enterprise** is a group or association of individuals and legal entities who have associated together for a common purpose of engaging in a course of conduct. To prove the existence of an "association-in-fact enterprise," the government would have to prove: (1) that the group had a purpose and longevity sufficient for the members of the group to pursue its purpose; (2) that the group had an ongoing organization, formal or informal, with some sort of framework for carrying out its objectives; (3) that there was a relationship among the members of the group and that the members of the group functioned as a continuing unit to achieve a common purpose; and (4) that the enterprise existed separate and apart from the alleged pattern of racketeering activity.

An enterprise is **engaged in interstate commerce** when it is itself directly engaged in the production, distribution, or acquisition of services, money, goods, or other property in interstate commerce. Alternatively, an enterprise's activities affected interstate commerce if its activities in any way interfered with, changed, or altered the movement or transportation or flow of goods, merchandise, money, or other property between or among two or more states.

**Racketeering activity** refers to dozens of crimes, including but not limited to, bribery, wire fraud, mail fraud, extortion, and use of an interstate facility to further racketeering, the offenses charged in the proposed indictment.

A "**pattern or racketeering activity**" means at least two acts of racketeering activity, where: (1) at least one of the acts of racketeering activity occurred within ten years after the commission of a previous act of racketeering activity; (2) the acts of racketeering activity were related to each other; (3) the acts of racketeering activity amounted to or posed a threat of continued criminal activity; and (4) that a conspirator conducted or participated in the conduct of the enterprise's affairs *"through"* a pattern of racketeering activity, meaning that the acts of racketeering activity had a relationship or a meaningful connection to the enterprise.

### 18 U.S.C. §§ 1343 and 1346 (honest services wire fraud)

To obtain a conviction for wire fraud under 18 U.S.C. § 1343, the government would have to prove that a defendant:

(1)     Knowingly devised a scheme to defraud the public of its right to the honest services of a public official through bribery or kickbacks by materially false or fraudulent pretenses, representations or promises or willfully participated in such a scheme with knowledge of its fraudulent nature;

(2)     Acted with the intent to defraud; and

(3)     That in advancing, furthering, or carrying out the scheme, transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of

some kind by means of a wire, radio, or television communication in interstate commerce.

The term **honest services** refers to a public official or employee's duty of honest, faithful and disinterested service to the public and to the government that he or she serves. A public official breaches his or her duty of honest services by accepting or agreeing to accept a bribe or a kickback, that is, something of value with the intent to be influenced in the performance of an official act or acts.

A bribe requires the government to prove a **quid pro quo**, that is, an official action in return for the payment or benefit.

The term **official act** means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust. The public official need not actually perform an official act, or even intend to do so. When the defendant is a public official charged with receiving a bribe, it is sufficient if the public official agrees to perform an official act in exchange for a thing of value. This agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.

The improper **payment** or **benefit** may consist of money and other financial benefits whether given on a one-time basis or as a **stream of benefits** to the public official. In other words, when valuable benefits are accepted by a public official from another with the intent to obtain that official's actions on an "as needed" basis, so that when the opportunity presents itself that public official takes specific official action on the giver's behalf in return for those payments, that constitutes a breach of the public official's duty of honest service in exchange for a stream of benefits.

### 18 U.S.C. § 1343 (wire fraud)

To obtain a conviction for wire fraud under 18 U.S.C. § 1343, the government would have to prove that a defendant:

(1) Knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises or wilfully participated in such a scheme with knowledge of its fraudulent nature;

(2) Acted with the intent to defraud; and

(3) That in advancing, furthering, or carrying out the scheme, transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

### 18 U.S.C. § 1952 (Travel Act violation)

To obtain a conviction for violating the Travel Act, that is using a facility in interstate commerce to promote an unlawful activity, the government would have to prove the defendant:

(1) Used a facility of interstate commerce;

(2) Used such a facility with the intention to promote, manage, establish or carry on of unlawful activity described in Count 8 of the indictment; and that

(3)     After the use of the facility in interstate commerce, knowingly and deliberately did an act, or attempted to do an act, in order to promote, manage, establish, or carry on the unlawful activity described in Count 8 of the indictment.

The **unlawful activity** described in Count 8 of the indictment is **bribery**, illegal under the laws of Wisconsin.

### 26 U.S.C. § 7206(2) (filing false tax returns)

To obtain a conviction for filing false tax returns, the government would have to prove:

(1)     The defendant aided or assisted in, procured, counseled, or advised the preparation or presentation of a document in connection with a matter arising under the Internal Revenue laws;

(2)     The document was false as to a material matter; and

(3)     The act of the defendant was willful.

## VI.    TRIAL ISSUES

### A.     Motions *in Limine*

The parties filed numerous motions *in limine*, all of which the Court resolved either at a hearing on January 24, 2022, or in a written order dated February 18, 2022. There are no outstanding motions pending.

### B.     Stipulations

The government and the defendants have agreed to several stipulations, which hopefully will streamline the presentation of evidence during both phases of the trial. In particular, the parties have agreed to stipulate as to the authenticity – but not admissibility – of business records, bank records, public records, and tax records that might be offered into evidence. The parties also have agreed to stipulate that the wire transmissions identified as predicates for Counts 2 through 7 and 9 through 16 of the indictment crossed state lines and, thereby, affected interstate commerce.

C.  **The Government's Use of Audio Evidence**

As stated above, the government is planning to play excerpts from the October 30, 2014 public meeting of the Philadelphia City Council and four public meetings of the Milwaukee School Board. We have provided defense counsel with transcripts of all five excerpts, and we expect to be able to work with defense counsel on fixing any transcription errors well in advance of the trial. Defense counsel has indicated that they do not believe a *Starks* hearing will be necessary. At the trial, any transcripts will be synched with the recorded excerpts so the jury will be able to read along as the recording is played in the courtroom.

D.  **Use of Summary Documents as Substantive Evidence**

To promote an efficient presentation of the evidence and to aid the jury in understanding the voluminous records relevant to the defendant's schemes, the United States plans to introduce charts and other summary documents into evidence, pursuant to Federal Rule of Evidence 1006. That rule provides that, "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. With respect to the underlying records that support the summary exhibit, Rule 1006 requires the proponent to "make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." *Id.* Additionally, "the court may order the proponent to produce them in court." *Id.*

Under the Rule, parties are permitted "to use charts or other exhibits to summarize voluminous materials if a summary would be helpful to the jury." *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011). The Rule's "purpose . . . is to provide a practicable means of summarizing voluminous information." *United States v. Hevener*, 382 F. Supp. 2d 719, 729 (E.D. Pa. 2005) (internal quotation marks omitted). The district court retains broad discretion in

determining whether records are sufficiently voluminous or complex to qualify for admission under Rule 1006. *See, e.g.*, *Bansal*, 663 F.3d at 668 (3d Cir. 2011); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 299 (3d Cir. 1961). Notably, "Rule 1006 does not require that it be literally impossible to examine all the underlying records before a summary chart may be utilized, but only that in-court examination would be an inconvenience." *United States v. Onque*, 169 F. Supp. 3d 555, 574 (D.N.J. 2015) (alteration and internal quotation marks omitted), aff'd, 665 F. App'x 189 (3d Cir. 2016).

Once the requisite foundation is provided, a Rule 1006 summary may be admitted into evidence and go to the jury like any other admitted exhibit. *See, e.g., United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010); *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004). Because a Rule 1006 summary is itself evidence, no limiting or cautionary instruction is generally required. *See, e.g., United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998) (concluding that the district court was not required to give a limiting instruction when it admitted in evidence charts under Rule 1006)

E.    **Statements of Defendants Islam and Dawan**

During the investigation of this case, the government interviewed defendants Islam and Dawan and presented Dawan to the grand jury. Islam, for example, told investigators in March 2017 that: Chavous was hired by UCH to be a consultant whose focus was to raise money for the organization; Chavous reported to him; she did not raise any funds for UCH; and her contract was eventually terminated.[2] Islam remembered Chavous doing one thing for

_____

[2] A copy of the agent's memorandum of the interview of Islam is attached as Exhibit 1.

Universal – introducing him to Joel Greenberg – but the relationship was not fruitful enough for it to continue. Islam also told investigators that the idea for hiring Chavous at UCH came to him during a trip to Israel. Islam also denied hiring Chavous to get Johnson's help with a zoning change for the Royal Theater. Dawan, meanwhile, initially told investigators that he did not remember why Universal had hired Chavous. Dawan then provided lengthy testimony in the grand jury about a number of topics.[3]

The Federal Rules of Evidence provide that a statement is not hearsay if it "is offered against a party and is … the party's own statement, in either an individual or a representative capacity." Fed. R. Evid. 802(d)(2)(A). Thus, the government can present the jury with statements that Islam and Dawan made during the investigation, because those statements are non-hearsay when offered against the defendants. The same statements, however, would be hearsay if offered by or for the defendants, because Rule 801(d)(2) does not allow a party to "introduce his or her own statements through the testimony of other witnesses." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). Indeed, if such statements were admissible, "parties could effectuate an end run around the adversarial process by, in effect, testifying without swearing an oath, facing cross examination, or being subjected to first-hand scrutiny by the jury." *Id.*

Nor does Fed. R. Evid. 106 provide the defendants with a basis for seeking admission of Islam entire statement or Dawan's entire grand jury transcript. Rule 106 states that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." As the Third Circuit has

---

[3] A copy of Dawan's grand jury transcript is attached as Exhibit 2.

explained, "additional portions of a recording may be played 'if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding.'" *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008) (quoting *United States v. Soures*, 736 F.2d 87, 91 (3d Cir.1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)). "The Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *Hoffecker*, 530 F.3d at 192; *Soures*, 736 F.3d at 91.

Thus, if the government presents the jury with portions of Dawan's transcript, for example, the defendants will bear the burden of proving that any additional excerpt they seek to admit would satisfy that four-part test.[4] They should not be permitted to provide the jury with the entire transcript in order to do "an end run around the adversarial process by, in effect, testifying without swearing an oath, facing cross examination, or being subjected to first-hand scrutiny by the jury." *McDaniel*, 398 F.3d at 545.

## F.    Text Messages Among the Defendants

During the investigation, agents executed search warrants on the telephone of defendant Islam and recovered text message between him and each of the other defendants. The government may seek to introduce come of those text messages, and for reasons stated above, there would be no hearsay issues. The defendants, however, cannot introduce their own out-of-court statements contained in the text messages.

---

[4] The government is currently planning to read the following excerpts to the jury, identified by page and line: 2:1-12, 3:6-11, 6:23-8:12, 8:20-9:7, 9:17-16:18, 17:20-18:17, 19:7-26:10, 27:8-30:8, 30:18-35:11, 35:18-37:2, 37:10-42:6, 44:1-14, 49:11-50:5, 50:18-51:5, 51:9-52:11, 53:4-16, 55:4-59:21, 60:14-61:2

### G.   <u>Hostile Witnesses and Leading Questions</u>

Several people on the government's witness list have had close relationships with at least one of the defendants and have made it clear to the government that they are extremely reluctant to testify at the upcoming trial. This list includes former paramours of defendant Islam, the son of defendant Dawan, and a former employee of defendant Chavous. The government suspects that at least some of these witnesses will be less than forthcoming during their direct examinations.

Federal Rule of Evidence 611(c) provides that:

> leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony. . . When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

The Rule is clear that if the government's own witness is a hostile witness, the trial court may allow the government/prosecution to use leading questions. Perhaps because of the clarity of the Rule, the Third Circuit has not explicitly ruled on the issue. However, the circuits that have are supportive of the position that when confronted with a hostile witness, it is permissible for the trial court to allow the government/prosecution to use leading questions. *See e.g.*, *United States v. Bowie*, 618 F.3d 802, 815 (8th Cir. 2010) ("Leading questions on direct examination are permitted 'to develop the witness' testimony' and to inquire of a hostile or adverse witness."); *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 762 (5th Cir. 2008) (district court did not abuse its discretion in designating witness with feigned memory problems as adverse and allowing the government to examine by leading questions); *United States v. Meza-Urtado*, 351 F.3d 301, 303 (7th Cir. 2003) (where witness obviously became conveniently forgetful despite his agreement to help the government, the government could have treated him as a hostile witness and asked leading questions); *United States v. Olivo*, 69 F.3d 1057, 1065

(10th Cir. 1995) (situations where leading questions are allowed include where a witness is

hostile, or reluctant or unwilling). The district courts in the Third Circuit are also supportive, *see,*

*e.g.*, *United States v. Christy*, 2019 WL 6048951, at *1 (M.D. Pa. Nov. 14, 2019) (leading

questions may be asked of hostile, unwilling, or biased witnesses); *United States v. McLaughlin*,

1998 WL 966014, at *1 (E.D. Pa. Nov. 19, 1998) ("[R]ule 611(c) gives the judge discretion to

allow leading questions, on direct examination, of both hostile witnesses and witnesses

'identified with an adverse party.'"); *Vanemmerik v. The Ground Round, Inc.*, 1998 WL 474106,

at *2 (E.D. Pa. July 16, 1998) ("Even if a witness is not deemed to be 'identified with an adverse

party,' the court may find the witness to be 'hostile' and therefore subject to leading questions.");

   The extent to which leading questions are permissible is typically a matter that is

left to the sound discretion of the trial court and will only be disturbed on appeal when that

discretion is abused and results in an unfair trial. *Fattman v. Bear*, 249 Fed.Appx. 956 (3d Cir.

2007). Therefore, if any of the government's witnesses become hostile, we may ask the Court to

exercise its discretion, pursuant to Fed. R. Evid. 611(c), and permit the use of leading questions.

  **H.**  **Statements of the Defendants' Agents**

   The government plans to present some statements of the defendants' agents,

including the representation by Chavous' attorney that Chavous deleted nearly all of her emails

from 2012 and 2013. A statement is not hearsay under Rule 801(d)(2)(D) if offered against an

opposing party and "was made by the party's agent or employee on a matter within the scope of

that relationship and while it existed."  The plain language of the Rule and the Advisory

Committee notes make plain that this Rule should be liberally applied to admit any statements of

an agent so long as it is "on a matter within the scope of the relationship."  The Third Circuit has

relied on this Rule to affirm the admission of statements of agents. *United States v. Riley*, 621

F.3d 312, 337-38 (3d Cir. 2010)(statements of subordinate admissible pursuant to 801(d)(2)(D)). The Third Circuit has noted that the Advisory committee "calls for generous treatment of this avenue of admissibiltiy." *Marra v. Philadelphia Housing Authority*, 497 F.3d 286, 298 (3d Cir. 2007)(citing *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir.2003); *Abrams v. Lightolier Inc.*, 50 F.3d 1204 (3d Cir.1995); and *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir.1998)). In *Abrams*, the Third Circuit affirmed admission under Rule 801(d)(2)(D) of testimony by an employee, who had testified to a supervisor's statement of opinion in which the supervisor "repeatedly expressed the sentiment that the company frowned on older workers." *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1215 (3d Cir. 1995). The representation by Chavous' attorney that she destroyed two years' worth of emails falls into this hearsay exception.

There may also be other statements of the defendants' agents that the government will seek to admit during the trial, including representations of people who worked Universal, Councilman Johnson, or Chavous Consulting Such statements, many of which appear in emails, also would not be hearsay.

Conversely, if the defense seeks to admit such statements, they would be hearsay. For example, the defense may not seek to admit the representations by Chavous' lawyer regarding the reasons why Chavous deleted her 2012 and 2013 emails. If Chavous wants to provide an explanation, she will have to take the witness stand and testify about it, at which point she will be subject to cross-examination, and the jury can assess her credibility.

I. **Evidence Relating to a TD Bank Account Ending in x4935**

As part of the government's case-in-chief, we intend to present evidence that defendants Johnson and Chavous had substantial debts from early 2013 through 2014, which helps explain why they were willing to accept bribes from Islam and Dawan, as alleged in

Counts 9 and 10 of the indictment. As part of our proof, we plan to present evidence regarding

assets that Johnson and Chavous held in certain bank accounts and debts that they owed to

multiple creditors. Such evidence will tend to show that Johnson and Chavous were living

beyond their means in late 2012 and early 2013 and needed the $66,750 that UCH paid to

Chavous Consulting in 2013 and 2014 to pay their bills.

Throughout this period, however, Ms. Chavous was the owner of a bank account

at TD Bank, ending in x4935. Ms. Chavous had opened the account before marrying Johnson,

and bank records indicate that it had balances of: $45,571.60 on December 31, 2010; $49,167.37

on December 31, 2011; $43,335.95 on December 31, 2012; $24,412.10 on December 31, 2013;

and $39,358.95 on December 31, 2014. The defense may seek to present evidence relating to this

account and the funds in it for the purpose of arguing that Johnson and Chavous were in fine

financial shape in 2013 and 2014 and did not need to resort to a bribery scheme with Islam and

Dawan. This would be misleading.

Throughout 2013 and 2014, Chavous knew that she could not access most of the

funds in the TD Bank account because they were related to a political campaign that Chavous

knew was the subject of multiple governmental investigations: the 2012 campaign of Fatimah

Muhammad for Pennsylvania State Representative. Chavous and others had drafted Muhammad

to run against incumbent James Roebuck for his seat as the representative of Pennsylvania's

188th House District.

Chavous ran Muhammad's campaign but she sought to hide her personal

involvement, so she is not identified on any of the campaign's political filings with the Secretary

of State's Office. Chavous also used the TD Bank account to pay for tens of thousands of dollars

of campaign expenditures, but she tried to hide the fact that she had provided these funds. In

2012 and 2014, Chavous and others arranged for more than $44,000 to be transferred back into her TD Bank account from Muhammad's campaign, some of which was funneled through third-party political action committees ("PACs").

In early 2013, the Philadelphia Inquirer published an article suggesting that campaign finance laws had been broken in connection with the Muhammad campaign. Shortly thereafter, the Pennsylvania Department of State launched an audit of the campaign, and the Philadelphia Department of Ethics initiated a separate investigation of PACs that had contributed to the campaign. Chavous was aware of both investigations and wrote about them to other people associated with the campaign and the PACs. The audit ended in or about June 2014, at which time state officials told the campaign to retain records for at least another year.  Chavous complied and did not substantially access the funds in her TD Bank account during that time.

The defense knows this, as we have provided defense counsel with discovery detailing the alleged campaign finance law violations. We would be happy to provide the Court with more information about this matter upon request. For purposes of the trial, however, the government does not intend to elicit evidence about this investigation in our case-in-chief.

Instead, during our direct examination of FBI Special Agent Richard J. Haag, we plan to elicit evidence only that, "Ms. Chavous had a separate bank account at TD Bank, but was not able to fully access the funds in this account until 2015." Only if the defense seeks to elicit evidence about the TD Bank account, either through its cross-examination of Special Agent Haag or in its case-in-chief, would the government explain why Chavous was unable to access these funds.

**J.      Subjects for Possible Cross-Examinations of Defendants**

Although the government plans to limit its presentation of evidence in Phase One to comply with the Court's rulings, we may seek to revisit this issue if the defendants opt to testify in their own defense. For example, if Islam takes the witness stand in Phase One, depending on his testimony, the government may ask the Court for permission to cross-examine him about matters currently reserved for Phase Two, such as the illegality of some of his claimed expenses for reimbursement from Universal and false tax filings. Similarly, if Chavous testifies, the government likely will seek to cross-examine her about the TD Bank account referenced above and her efforts to hide her connection to the 2012 Muhammad campaign.

These issues may be mooted if the defendants do not testify.

**K.      Good Friday/Passover**

Friday, April 15, 2022, is both Good Friday and the first night of Passover. If the trial has not concluded by then, we would request a day off to accommodate religious observances.

Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


*/s/ Mark B. Dubnoff*
ERIC L. GIBSON
MARK B. DUBNOFF
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

David M. Laigaie
Joshua David Hill
Jessica Southwick
Eckert Seamans Cherin & Mellott LLC
Two Liberty Pl
50 South 16th St 22nd Fl
Philadelphia, PA 19102
*Counsel for Abdur Rahim Islam*

Thomas O. Fitzpatrick
Mincey Fitzpatrick Ross, LLC
1650 Market Street
36th Floor
Philadelphia, Pa 19102
*Counsel for Shahied Dawan*

Patrick J. Egan
Nathan Huddell
Stephanie Ohnona
Fox Rothschild LLP
2000 Market Street 20th Floor
Philadelphia, PA 19103
*Counsel for Kenyatta Johnson*

Barry Gross
Elizabeth Casey
Faegre Drinker Biddle & Reath LLP
One Logan Square
Ste 2000
Philadelphia, PA 19103
*Counsel for Dawn Chavous*

/s/    *Mark B. Dubnoff*
MARK B. DUBNOFF
Assistant United States Attorney

Dated:  March 14, 2022.

48