**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | **No. 20-45-1, 2** |
| | : | |
| **ABDUR RAHIM ISLAM** | : | |
| **SHAHIED DAWAN** | : | |

**McHUGH, J.**                                                                                          **July 7, 2023**

## <u>MEMORANDUM</u>

This is a motion to dismiss an indictment based on double jeopardy.  Defendant Abdur Rahim Islam, joined by Defendant Shahied Dawan, argues that a mistrial was improperly declared, and they cannot be retried without violation of their Fifth Amendment rights.  In advancing their arguments, Defendants ignore the fact that they refused to continue to verdict with eleven jurors – jurors who had already acquitted them in the first phase of the trial.  They also ignore the surrounding context, which played a critical role in the Court's decision making.  In fact, the argument they have constructed requires them to reach back in time to challenge the excusal of a juror two days prior to the declaration of mistrial, when the juror experienced an unexpected death in his family.  These arguments lack merit.  When one of the twelve remaining jurors later contracted COVID-19, with no alternates remaining, and Defendants declined to proceed with a jury of eleven, there was manifest necessity to declare a mistrial.  I will therefore deny the motion.

## I.      Relevant Background

The history of this criminal prosecution is complicated and extensive, including two bifurcated trials.  I review only the facts necessary for the resolution of this motion.

### A.  Procedural History

The Government indicted Mr. Islam and Mr. Dawan, alongside co-defendants Councilman Kenyatta Johnson and Ms. Dawn Chavous, in January 2020, charging them with various financial crimes and political corruption.  ECF 1.  On January 29, 2021, I granted a motion for severance filed by defendants Johnson and Chavous, holding that Counts 9 and 10 of the indictment (political corruption) would be severed and tried separately from the remaining counts.  ECF 76 and 77. Rather than hold separate trials, I granted the request of the Government, one joined by Defendants Islam and Dawan, not to have separate trials but rather to proceed with a bifurcated trial, focusing first on the alleged Johnson-Chavous bribery scheme while limiting evidence bearing on the remaining charges against only Islam and Dawan.

Jurors reported for service on September 28, 2022 and were asked to make a commitment of four to six weeks.  Tr. Sept. 28, 28:7-12, ECF 439.  All counsel agreed that the Court should neither advise the jurors about the bifurcated nature of the trial nor reveal that a second phase would begin immediately after they reached a verdict in Phase I, seeking to avoid any undue prejudice to Defendants.  Phase I of the trial proceeded on that basis.  A week was lost when one of the Defendants contracted COVID, but all jurors faithfully returned after that hiatus. Deliberations for Phase I began on October 27.

When this case was first tried in March 2022, the jury hung.  This time, deliberations in the retrial were marked by an increasing series of questions from the jury room ultimately focusing on the conduct of a particular juror.  The Court proceeded with great caution, so as not to influence the deliberative process, but ultimately engaged in a procedure where almost every member of the panel was interviewed.  This led to the removal of a juror whose strong religious conviction was impairing her ability to deliberate.  ECF 436.  For present purposes, the earlier problem with one of the jurors is relevant to the Court's evaluation of the level of stress endured by the jury, and

how that impacted their morale and ability to continue service when further impediments arose. On November 2, exactly five weeks after the jurors had reported for service, the jury acquitted Mr. Islam and Mr. Dawan of the honest services wire fraud charges tried in Phase I.

After the jury announced its verdict, I informed the jurors that they still had remaining duties, and to report back to court the following day. Until then, to avoid prejudice to the defense, there had been only two vague references to Phase II. On October 26, after closing argument, having been advised by my Deputy Clerk that jurors were asking questions about when their service would end, I cautioned them that they should not make "unwarranted assumptions" about schedule as there would be "additional findings of fact" to make after their verdict, while reassuring them that "we're within the timeline we asked of you." Tr. Oct. 26, 234:4-12, ECF 465. At the end of the first day of deliberations on October 27, a juror directly asked if a verdict would end their service. Tr. Oct. 27, 67:4-16, ECF 455. Once again, the jurors were told in deliberately vague terms on that they would need to make "additional findings of fact." *Id.*

The jury was therefore not fully informed of the scope of their additional responsibilities – the need to consider a series of additional charges – until it returned its verdict in Phase I. Not surprisingly, after four days of difficult deliberation, jurors exhibited a strong negative reaction. Testimony nonetheless resumed and continued through the end of that week. On Saturday November 5, one of the twelve remaining jurors[1] contacted the Court and reported that she had tested positive for COVID-19. The Court informed counsel and scheduled a conference call for Sunday at noon, requesting that counsel consider whether we could proceed under Rule 23 with an eleven-person jury. Tr. Nov. 7, at 3:5-16, ECF 463. During the call, I discussed with the parties

---

[1] Trial commenced with five alternate jurors. One was excused because of family obligations; one for illness; one for religious beliefs impeding the ability to deliberate; and two because of deaths in their families.

whether it would be practical to adjourn and wait to resume after the juror's recovery, at least a week under CDC Guidelines, but I noted that (1) another juror was also recently exposed to COVID, (2) two other jurors had expressed concern to my Deputy that several fellow jurors were not being paid during their lengthy service, and (3) the foreperson has a long-planned an international family trip scheduled to commence in mid-November. Based on these factors, I determined that "the cumulative stress on the jurors" made adjourning for a *minimum* of another week impractical. Counsel advised that Defendants would not consent to proceeding with an eleven-person jury under Federal Rule of Criminal Procedure 23(b)(2)(B). *Id.* at 6:9-12. When court resumed the next day, I found a manifest necessity to declare a mistrial.

### B.   Antecedent Events

Previously, on the morning of November 3 – the first day of Phase II of the trial – problems affecting two jurors emerged. Approximately three weeks before, Juror 7 alerted the Court that his intimate partner's mother was severely ill and had entered hospice in Kentucky. He was persuaded to continue serving on the jury for as long as he could, and counsel was advised. Tr. Oct. 18, 182:2-22, ECF 449. She died during the night of November 2, and that juror expressed that he was "extraordinarily upset" about the "prolonged proceedings" and his need to get to Kentucky. Tr. Nov. 3, 69:14-70:20, ECF 461. Finding him "distraught and distracted," I discharged him from service with no objection from counsel. *Id.*

Separately, Juror 6 suffered a sudden death in his family, and a funeral was scheduled for the following morning. *Id.* at 8:21-25. I advised counsel of my intention to meet with Juror 6 during the mid-morning break to assess his ability to continue serving. *Id.* Previously, the prosecution team had asked that trial be adjourned on Election Day, as the U.S. Attorney's Office had a team of three attorneys assigned to its election detail, two of whom were prosecuting this case. Before meeting with Juror 6, I previewed my concern that election day – Tuesday, November

8 – was fast approaching, noting that both prosecutors had "important duties" to attend to that day. *Id.* at 9:19-10:6. I also observed that the following Wednesday, November 9, would mark six weeks since the beginning of jury selection. *Id.* at 10:13-20. I then reaffirmed my intention to "speak to [Juror 6] and see whether or not we can manage to keep him on board." *Id.* at 10:18-20.

At sidebar after the jury was dismissed for lunch, I briefed counsel about my discussion with Juror 6, who reported he had lost his 36-year-old first cousin in a "tragic and unexpected death." *Id.* at 70:21-23. I relayed that the juror was "very upset and emotionally distraught" because of the "sudden and shocking death." *Id.* at 70:23-71:7. When I asked Juror 6 "whether he [could] hang in because of [the] need to maintain a constitutional mass of jurors," the juror said, "Judge, I'm having trouble even concentrating at this point" and "I'm really having a hard time." *Id.* at 71:3-12. I explained to counsel that while I was hesitant to discharge the juror because "we have no more alternates," the juror is "mourning [and] distracted." *Id.* at 71:14-18.

I then explained to counsel that I had also asked Juror 6 if he would be able to go to the memorial service the following morning and reconvene for trial in the afternoon. *Id.* at 72:3-10. I described Juror 6's response as "distraught," and explained that he told me, "I have to be honest with you, Judge, I'm really distracted." *Id.* I thus concluded that this was "not a welcome suggestion" and that the "juror's emotional state . . . [is] genuine based upon his description" of the events, especially based on his statement that his cousin "was 36 . . . I mean, and she just died, and, you know, we're shaken.'" *Id.* at 72:10-15. I specifically noted to counsel that the decedent was the juror's "contemporary within the family." *Id.* at 72:17-20.

At that time, Mr. Fitzpatrick, counsel for Mr. Dawan, suggested that the Court adjourn for the following full day (Friday, November 4), allowing Juror 6 time for the funeral and three consecutive days (including Saturday and Sunday) to be with his family. *Id.* at 72:21-25. I

responded, "[w]e then prolong the service of all the other jurors and as Mr. Dubnoff observed and I confirmed this, the jury is obviously disappointed in the fact that it has additional work to do." *Id.* at 73:1-7.   When Mr. Laigaie, counsel for Mr. Islam, expressed his concern about losing a twelve-member jury, I responded, "but if you have a juror who I think genuinely said, 'Judge, I'm not here' and it is understandable that they're not here, meaning here mentally for concentration, that's very problematic." *Id.* at 74:4-10.   Mr. Fitzpatrick repeated his suggestion, and I agreed to give all counsel time to consider the options. *Id.* at 74:21-75:11.   Before departing for lunch, I added: "it does not sound to me as if we are going to complete the evidence in time to be putting this case in the hands of the jury on election day, which means we lose that day as well.   So we would be adjourning tomorrow, coming back Monday, adjourning Tuesday.   I think that is another reality that will spark potential rebellion on the part of the jurors." *Id.* at 76:7-13 (cleaned up).

After the lunch break, I informed counsel at sidebar that I learned from my criminal deputy that the other jurors "are aware of the situation[]" with Juror 6 and are "looking to see how the Court intends to respond," creating a "credibility issue." *Id.* at 77:2-9.   I noted that we faced "unwelcome choices," but that the juror "has communicated that he is completely distracted by grief and explained genuinely the tragic circumstances of the death." *Id.* at 77:9-15.   I reiterated that the defense's suggested plan would require adjournment Friday, coming back Monday, and then adjourning again on Tuesday for election day while the Government prosecutors attended to election-related duties. *Id.* at 77:20-25.   I affirmed that "the integrity of elections is a vitally-important national interest at this point" and that I did not "see an alternative other than to release [the prosecutors] to perform those duties." *Id.* at 78:1-4.

Further, even if I had adjourned trial the next day, I explained:

> [W]e still have the problem with [Juror 6] participating later this afternoon . . . in a situation where he's communicated his distress.

> *And again, I have to assess that and I assess it as genuine.  And I was observing him through the rest of the proceedings and can tell that he is not following the evidence as it's being presented.*  So it would really mean that we'd either have a juror who's already been distracted and who will continue to be distracted through the rest of the day and then take a day off.  And as I weigh all those circumstances, as little as I want to go down to 12 jurors, I think that is the appropriate conclusion with me addressing the jury about the need for their commitment through the rest of the process.  I think that if I show appropriate concern for this juror and then explain to the other jurors the circumstances we face, I actually think that could be more of a motivating factor . . . than if I tell them we're going to stop and start in a way that [would] be required if I were to keep [Juror 6] on the jury.

*Id.* at 78:5-24 (emphasis added).  I thus concluded, "I have two bad alternatives and I'm choosing the one that I think most respects the integrity of the trial process," and dismissed Juror 6.  *Id.* at 79:1-3.  Trial then continued through Friday, November 4 with the remaining twelve jurors,[2] until another juror reported her COVID diagnosis on Saturday.

### C.  Declaration of Mistrial

On Monday, November 7, after reviewing the weekend events on the record – including my conversation with counsel regarding the twelfth juror's COVID diagnosis – and confirming Defendants' refusal to proceed with a panel of eleven jurors, a mistrial was formally declared. ECF 463.

## II.  Discussion

### A.  Manifest Necessity

Once jeopardy has attached, a defendant may be retried only by consent, waiver, or when there is "manifest necessity to terminate the first trial."  *Love v. Morton*, 112 F.3d 131, 136-37 (3d Cir. 1997).  A mistrial is appropriate when there is a "high degree" of necessity, though the standard "cannot be interpreted literally."  *Renico v. Lett*, 559 U.S. 766, 774 (2010) (citing *Arizona*

---

[2] The remaining two alternates had rejoined the panel at the start of Phase II and had heard all the evidence.

*v. Washington*, 434 U.S. 497, 506 (1978)); *see Crawford v. Fenton*, 646 F.2d 810, 817 (3d Cir. 1981) ("[T]he term 'necessity' as it is used in the manifest necessity test cannot be mechanically applied, but must rather relate to the particular circumstances giving rise to the mistrial."). Trial judges have "broad discretion" to grant a mistrial, and their decisions are reviewed under an abuse of discretion standard. *Crawford*, 646 F.2d at 817; *Renico*, 559 U.S. at 774.

A mistrial may be appropriate where "there is danger that inherent pressures of the particular situation rather than the jurors' individual judgments" will lead to a verdict. *Crawford*, 646 F.2d at 817, 819; *see Washington*, 434 U.S. at 509-10. Should this situation present itself, the district court should assess the availability of alternative paths forward. *See Crawford*, 646 F.2d at 818, 818 n.9. The Third Circuit has explained:

> It is clear that the more obvious and adequate the alternative [to a mistrial] is, the greater the role it must play in the trial judge's discretionary determination of whether a manifest necessity exists to declare a mistrial. Conversely, the less obvious and adequate the alternative, the less compelling influence such an alternative need play in the trial judge's determination. Thus, there can be no question but that consideration of alternatives is required, but that consideration is not invariably of controlling significance. Each case of course turns on its particular facts.

*Id.* at 818 n.9. A court therefore ought to consider the strengths and weaknesses of alternative paths and avoid declaring a mistrial if an obvious and adequate alternative is available.

Significantly, Defendants here do not take issue with the Court's characterization of the posture of the case when the mistrial was declared. Rather, they argue that the dismissal of Juror 6 was not needed and therefore "the proximate cause of the mistrial declared two trial days later," undermining the Court's finding of manifest necessity. ECF 470-1 at 3. I disagree. First, dismissal of Juror 6 was ***not*** the proximate cause of the mistrial. After Juror 6 was excused, a different juror contracted COVID-19, and even then a mistrial would have been avoided had Defendants agreed

to move forward with eleven jurors.  Other events occurred between the dismissal of Juror 6 and the declaration of the mistrial that in combination created a manifest necessity.

Indeed, Defendants' refusal to continue the trial with eleven jurors weighs heavily against their position.  *See United States v. Oliveras-Gonzalez*, No. 05-235, 2011 WL 1833087, at \*2-3 (D.P.R. Feb. 25, 2011), *report and recommendation adopted sub nom. United States v. Marrero-Cruz*, No. 05-235, 2011 WL 1832757 (D.P.R. May 13, 2011) ("In short, the totality of the circumstances dictate that the mistrial was declared due to manifest necessity and after the court adequately considered the clear practical alternative of proceeding with eleven jurors [and Defendant refused]."); *United States v. Campbell*, 544 F.3d 577, 583 (5th Cir. 2008) ("We have previously affirmed a district court's decision to declare a mistrial when the defense counsel objected to continuing a trial with only eleven jurors."); *United States v. Reyes-Hernandez*, No. 21-50244, 2022 WL 16548017, at \*1 (9th Cir. Oct. 31, 2022) (concluding that there was manifest necessity for a mistrial when a defendant objected to proceeding with eleven jurors); *see also United States v. Ruggiero*, 846 F.2d 117, 124 (2d Cir. 1988) (holding judge did not abuse discretion in finding manifest necessity when the parties never offered a stipulation consenting to a jury of eleven); *United States v. Toribio-Lugo*, 376 F.3d 33, 39 (1st Cir. 2004) (finding no manifest necessity when the court did not "adequately explore" the option of proceeding with eleven jurors); *United States v. Garske*, 939 F.3d 321, 334 (1st Cir. 2019) (finding manifest necessity because the government did not consent to proceeding with eleven jurors).

Additionally, the Court meaningfully considered and explored alternative options to dismissing Juror 6 on the record, and further sought counsel's feedback.  Preliminarily, I met with Juror 6 and asked him to remain on the jury.  In addition, I painstakingly considered the alternative offered by Mr. Fitzpatrick, rejecting it because (1) Juror 6 had already been distracted for a whole

morning of evidence and would continue to be so for the afternoon, (2) the rest of the jury panel was watching closely to see if the Court respected Juror 6's wish to be relieved, creating concerns over their morale and motivation, and (3) keeping Juror 6 would force the Court to adjourn the trial for Friday, resume on Monday, and then adjourn again on Tuesday, stoking further disruption for a panel that was already visibly distraught.  And counsel was consulted during each step of my decision-making process.  *Cf. U.S. ex rel. Webb v. Court of Common Pleas of Phila. Cnty.*, 516 F.2d 1034, 1043 (3d Cir. 1975) (holding no manifest necessity where the court failed to consult with or inform counsel prior to declaring a mistrial).  In the end, when presented with two poor options and with no immediate risk of mistrial, I concluded that dismissing Juror 6 was the best course and that no "obvious and adequate" alternative was available.  *See Crawford*, 646 F.2d at 818, 818 n.9.

Finally, courts have found a manifest necessity for a mistrial when a juror is dismissed for a death in the family.  *See Saylor v. Cornelius*, 845 F.2d 1401, 1405 (6th Cir. 1988) (citing 1 Wharton's Criminal Law § 61 (14th Ed. 1978 & Supp. 1987)) (observing that manifest necessity has justified a mistrial for "illness or death of a member of a juror's family"); *Rath v. Att'y Gen. of Colo.*, No. 06-cv-419, 2008 WL 1930633, at *18 (D. Colo. May 1, 2008) (finding that it was not objectively unreasonable for the court to find a death in the family of a juror to constitute manifest necessity); *cf. Cherry v. Dir., State Bd. of Corr.*, 613 F.2d 1262, 1267 (5th Cir. 1980) (concluding that the death of a juror's parent was not a manifest necessity when "the trial judge apparently did not canvass the alternatives such as a continuance" and where the judge did not inquire if the juror "would have been willing to continue hearing the trial").  Moreover, considerations like juror fatigue, ability to concentrate, frustration, and length of service are all proper considerations in an analysis of manifest necessity.  *See Crawford*, 646 F.2d at 819

(considering how the jurors' attitudes could impact the "real possibility [] that a consistent and unanimous verdict would be the product of the confusion and coercion inherent in the situation, rather than a product of the jurors' individual judgments").  Notably, in this case, dismissal of Juror 6 did not even create a mistrial.  Logically, however, if it is proper to excuse a juror because of a death in the family *even when it would create a mistrial*, necessarily excusal of a juror on similar grounds is permissible when the trial can continue with twelve jurors.   Given Juror 6's representations that he was distracted by grief, the Court's assessment that his distress was genuine and warranted, the Court's observation of him as the morning session continued, the decision to dismiss him was objectively reasonable.

To argue in the alternative, Defendants liken their case to *United States v. Pharis*, 298 F.3d 228 (3d Cir. 2002), among others.  None of the analogies are convincing.  In *Pharis*, for example, a trial court dismissed a jury pending an interlocutory appeal on a question of law that the judge neglected to resolve before trial.  The Third Circuit held that there was no manifest necessity to declare a mistrial, in part because the court could have stayed the trial without discharging the jury. *Id.* at 242.  But the jury in *Pharis* had served for no more than a few days at the time of the interlocutory appeal, *id.* at 233; here, the jury had been empaneled for over five weeks and had endured four days of stressful deliberation resulting in the dismissal of one juror, only to learn that their service would continue with evidence of additional charges.  Both counsel and the Court observed on the record that the jurors were frustrated and fatigued.  And, when Juror 6 was excused two days prior, a full complement of jurors remained.

Significantly, when the Court declared its intention to declare a mistrial because a minimum of one week's delay would be required by COVID protocols, the defense did not advocate that such a hiatus would be practical.  When counsel was asked if there was anything to

add, Mr. Islam's counsel replied "no" and Mr. Dawan's counsel remained silent.   When specifically asked if counsel had any objection to the Court's description of there being a manifest necessity to declare a mistrial, Mr. Islam's counsel again said "no," with Mr. Dawan's counsel again remaining silent.   Only thereafter did Mr. Islam's counsel suggest he wanted to explore potential issues of double jeopardy, still without either Defendant offering any alternative given the facts as they existed.   ECF 463, pp. 7:8-10:7.   Whether or not this rises to the level of consent – as argued by the Government – Defendants' failure to suggest any practical path forward simply underscores that there was none.   A claim of double jeopardy rings hollow.

## III.    Conclusion

For the reasons set forth above, Defendants' Motion to Dismiss for Double Jeopardy will be denied.   An appropriate order follows.


      /s/ Gerald Austin McHugh    
United States District Judge